## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHERYL MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-CV-96-TCK-PJC |
| | ) | |
| (1) STEPHANIE SPRING, an individual, | ) | |
| (2) JON WHEELER, an individual, | ) | |
| (3) LATRICIA PRUITT, an individual, | ) | |
| (4) KEITH BALLARD, in his individual | ) | |
| and official capacities, | ) | |
| (5) TULSA PUBLIC SCHOOLS, a state | ) | |
| governmental entity, | ) | |
| (6) TULSA PUBLIC SCHOOLS BOARD | ) | |
| OF EDUCATION, a state governmental | ) | |
| entity, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are The School District Defendants' Motion to Dismiss Certain of the

Plaintiff's Claims (Doc. 9); Defendants' Spring and Wheeler's Motion to Dismiss (Doc. 12); and

Defendant Latricia Pruitt's 12(b)(6) Motion to Dismiss (Doc. 23).

**I.    Factual Allegations**

Plaintiff Cheryl Murphy ("Murphy") alleges the following facts in her Petition, which was

filed on December 14, 2012 in Tulsa County District Court.[1]  Murphy was employed by Tulsa Public

Schools ("TPS")[2] as the Administrative Assistant to TPS Athletic Director Stephanie Spring

("Spring").  Defendants Jon Wheeler ("Wheeler") and Latricia Pruitt ("Pruitt") were Assistant

Athletic Directors.  Sometime before June 2011, Murphy reported to "TPS Administrators" that

---

[1]  The case was removed to this Court on February 15, 2013.

[2]  The legal name for TPS is Independent School District No. 1 of Tulsa County, Oklahoma.

Spring, Wheeler, and Pruitt had "endangered the health and safety of students" and "misappropriated school funds." (Pet. ¶ 17.)  In June 2011, Spring, Wheeler, and Pruitt suspended Murphy's employment and recommended her for termination. (*Id.* ¶ 16.)  Murphy alleges that Spring gave false reasons for recommending Plaintiff's termination and acted in retaliation for Murphy's reporting of illegal conduct.  Murphy further alleges that Wheeler and Pruitt "conspired together for Plaintiff's termination in retaliation for her reporting of their illegal behaviors." (*Id.* ¶ 20.)

Between June and August 2011, Murphy underwent administrative review hearings regarding her TPS employment.  During this time period, Spring, Wheeler, and Pruitt "intentionally accessed or procured other persons to access" Murphy's private emails, including private communications related to the administrative process.  Spring, Wheeler, and Pruitt then "used the emails and information obtained therefrom against [Murphy] with respect to her termination." (*Id.* ¶ 23.)  Murphy discovered that her private email account had been accessed upon being contacted by the Tulsa Police Department's cyber crimes division.  Murphy alleges that Spring, Wheeler, and Pruitt accessed and used the emails while in the scope of their TPS employment.

Defendant Keith Ballard ("Ballard"), the TPS Superintendent, and Defendant Tulsa Public Schools Board of Education ("Board") were the decision-makers regarding Murphy's employment with TPS.  Ballard and the Board "demoted [Murphy] to a nonexistent position in the Transportation Center" and then "shortly thereafter her employment was terminated again." (*Id.* ¶ 19.)[3]  Murphy alleges that Ballard and the Board were aware of Murphy's prior reporting of misconduct and that their adverse employment decisions "were made on the basis of her reports of illegal activity."

---

[3] The word "again" appears to be in error.  Murphy alleges that she was demoted and then terminated, rather than terminated twice.

Murphy also alleges that Ballard and the Board were aware that Spring, Wheeler, and Pruitt had illegally accessed Plaintiff's email account during the administrative process but failed to discipline them.

In her Petition, Murphy alleges the following causes of action: (1) violation of 42 U.S.C. § 1983, based on violation of her First and Fourth Amendment rights, asserted against all Defendants; (2) violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, also known as the Electronic Communications Privacy Act ("ECPA"), asserted against Spring, Wheeler, Pruitt, and TPS; (3) violation of the Oklahoma Security of Communication Act ("OSCA"), asserted against Spring, Wheeler, Pruitt, and TPS; (4) invasion of privacy, asserted against Spring, Wheeler, Pruitt, and TPS; (5) intentional infliction of emotional distress ("IIED"), asserted against all Defendants; and (6) *Burk* tort for termination in violation of public policy, asserted against TPS and the Board.[4] Claims are asserted against Ballard in his individual and official capacities. Claims are asserted against Spring, Wheeler, and Pruitt in their individual capacities.

## II.     Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted.  The inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "'nudge [ ] [his] claims across the line from conceivable to plausible.'"  *Id.* at 1177 (quoting *Twombly,* 550

---

[4]  As explained *infra* Part V.B, this tort is based upon the Oklahoma Supreme Court's decision in *Burk v. K-Mart Corporation*, 770 P.2d 24 (Okla. 1989).

U.S. at 547).  Thus, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Id.*

The Tenth Circuit has interpreted "plausibility," the term used by the Supreme Court in *Twombly*, to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Id.* (internal quotations omitted).  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.* "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248.  In addition, the Tenth Circuit has stated that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context." *Id.*

## III.    Board's Motion to Dismiss

This Court has held that Oklahoma school boards are not separate, suable entities.  *Primeaux v. Indep. Sch. Dist. No. 5 of Tulsa Cnty. Okla.*, Case No. 12-CV-393-TCK, 2012 WL 5986793, at * 2 (N.D. Okla. Nov. 29, 2012) ("Based on the language of the Oklahoma statutory scheme, the Court concludes that Oklahoma school boards are not separate, suable entities. The Court further concludes that, where an Oklahoma school district is named as a defendant, any claims against the school board

4

are duplicative of claims against the school district.").   Thus, all claims against the Board are dismissed.[5]

## IV.     Ballard's Motion to Dismiss IIED Claim

Ballard moved to dismiss the IIED claim asserted against him based on her failure to allege any extreme or outrageous conduct.  In order to succeed on an IIED claim, a plaintiff must ultimately prove:  (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff to suffer emotional distress; and (4) the plaintiff's emotional distress was severe.  *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir.1991) (applying Oklahoma law).  To satisfy the extreme and outrageous element, a plaintiff must prove the defendant's conduct was so extreme and outrageous as to be beyond all possible bounds of decency.  *Eddy v. Brown*, 715 P.2d 74, 77 (Okla.1986) ("Conduct which, though unreasonable, is neither beyond all possible bounds of decency in the setting in which it occurred, nor is one that can be regarded as utterly intolerable in a civilized community, falls short of having actionable quality.") (quotations omitted).  Oklahoma law directs the district court to act as a "gatekeeper" and make an initial determination about the outrageousness of the defendant's conduct before sending the claim to a jury.  *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1377-78 (Okla.1978) ("The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded so extreme and outrageous as to permit recovery . . . .").

In this case, Murphy alleges that Ballard demoted and terminated her because she reported her supervisors' endangerment of TPS students and misappropriation of TPS funds.  Murphy alleges that Ballard did so with knowledge that these supervisors accessed Murphy's private documents and

---

[5]  Murphy failed to respond to the Board's motion to dismiss.

used them against her during administrative proceedings.  Although many employment-related fact scenarios do not support IIED claims, *see Gabler v. Smith*, 11 P.3d 1269, 1280 (Okla. Civ. App. 2000) (collecting cases involving insults and other harassing behavior in the workplace), Murphy's allegations go beyond a typical termination or harassment scenario and could more plausibly be deemed outrageous in nature, *see Kisselburg v. AR Allen Group, Inc.*, No. 05-0715-F, 2005 WL 2897431, at *4 (W.D. Okla. Nov. 1, 2005) (denying motion to dismiss IIED claim where the plaintiff was terminated after reporting occupational safety and health risks related to dangerous repair of an aircraft) ("[G]iven the nature of the allegations in this case as involving matters of aviation safety, the court determines that this claim should not be foreclosed at the pleadings stage.").  Thus, Ballard's motion to dismiss is denied.

## V.      TPS' Motion to Dismiss

TPS filed a partial motion to dismiss, seeking dismissal of the IIED claim, *Burk* claim, and all claims for punitive damages.

### A.      IIED Claim

TPS may not be sued for torts committed by employees acting outside the scope of employment.  *See* Okla. Stat. tit. 51, § 153(A).  Because it requires bad faith, IIED is necessarily committed outside the scope of employment.  *See Harmon v. Cradduck*,  286 P.3d 643, 650 (Okla. 2012) ("[A]ny malicious or bad faith act by an employee falls outside the scope of employment for purposes of the GTCA."); *McMullen v. City of Del City*, 920 P.2d 528, 531 (Okla. Civ. App. 1996) (affirming grant of summary judgment on IIED claim against governmental entity because there was "no way to prove a claim for outrage if the defendant has acted in good faith").[6]

---

[6]    Murphy failed to respond to TPS' motion to dismiss the IIED claim.

## B.    *Burk* Wrongful Discharge Claim

In 1989, the Oklahoma Supreme Court created a narrow "public policy" exception to the employment-at-will doctrine, which is commonly referred to as a *Burk* tort.   *See Burk v. K–Mart Corp.*, 770 P.2d 24, 29 (Okla. 1989) (holding held that an employee who is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy may bring a tort claim for wrongful discharge).   One element of a *Burk* tort is that the plaintiff "must establish that he or she was an at-will employee." *McCrady v. Okla. Dep't of Pub. Safety*, 122 P.3d 473, 475 (Okla. 2005); *see also Wilson v. L-3 Commc'ns Vertex*, No. CIV-07-767, 2009 WL 1564226, at *3 (W.D. Okla. June 4, 2009) (explaining that, although the Tenth Circuit had previously permitted a "for cause" employee to maintain a *Burk* claim, the Oklahoma Supreme Court has since "held that only at-will employees are permitted to bring *Burk* tort claims") (citing *McCrady*).   "At-will employment means the master may hire or discharge at will and the servant may work or refuse to work at will."   *Glasco v. State ex rel. Okla. Dep't of Corr.*, 188 P.3d 177, 182 n.9 (Okla. 2009).   "The at-will employment doctrine applies to employment contracts that have no definite duration and recognizes that either the master or servant may end the employment at will."   *Id.*; *see also Burk*, 770 P.2d at 26 (explaining that at-will employment contracts are of an "indefinite duration").

TPS argues that Murphy could not have been an "at will" employee at the time of her termination, based upon the statutory scheme governing school district support employees set forth in title 70, section 6-101.40-47 of the Oklahoma Statutes.   Title 70, which governs schools, states the following regarding the "suspension, demotion, termination or nonreemployment for cause of support employee:"

7

> A support employee who has been employed by a local board of education for more than one (1) year shall be subject to suspension, demotion, termination or nonreemployment only for cause, as designated by the policy of the local board of education, adopted as provided in Section 6-101.43 of this title. This section shall not be construed to prevent layoffs for lack of funds or work. For purposes of this act, "support employee" means a full-time employee of a school district as determined by the standard period of labor which is customarily understood to constitute full-time employment for the type of services performed by the employee who is employed a minimum of one hundred seventy-two (172) days and who provides those services, not performed by professional educators or licensed teachers, which are necessary for the efficient and satisfactory functioning of a school district and shall not include adult education instructors or adult coordinators employed by technology center school districts.

Okla. Stat. tit. 70, § 6-101.40 ("§ 6-101.40").[7]  Local school boards adopt policy statements defining the causes and procedures for suspension, demotion, termination, or nonreemployment of support employees. *Id.* § 6-101.43.  Under § 6-101.45, a school district must "give reasonable assurance of employment in writing to any support employee that the school intends to employ for the subsequent school year."  The statutory scheme also sets out certain required minimum procedures, including notice of a right to a hearing before the local school board prior to a demotion, termination, or nonreemployment. *Id.* § 6-101.47.  Unlike decisions regarding tenured teachers, decisions made by the local board regarding support employees "shall be final." *Id.*

The Oklahoma Court of Civil Appeals has described this statutory scheme as a "hybrid" scheme that permits adverse employment actions against support employees only upon three

---

[7]  Prior to 1993, this statute did not contain the words "or nonreemployment," and the Tenth Circuit held that the former version did not create a property interest in renewal of contracts from year to year.  *See Brown v. Indep. Sch. Dist. No. I-06 of McCurtain Cnty., Okla.*, 974 F.2d 1237, 1240 (10th Cir. 1992) (holding that school support employees whose contracts were not renewed did not have a property interest in employment because they did not have a statutory or contractual right to renewal of their contracts from year to year).  In 1993, the statute was amended to add the words "or nonreemployment," apparently in response to the *Brown* decision.

contingencies (rather than for any reason) but affords fewer procedural rights than those afforded to tenured teachers (such as *de novo* review of a school board decision in a district court).  *See Isch v. Okla. Indep. Sch. Dist. No. I-89 of State of Okla.*, 963 P.2d 18, 21 (Okla. Civ. App. 1998) ("[W]e view the relevant sections governing the employment and non-reemployment of support employees as a hybrid, i.e., permitting non-reemployment of support employees only on the happening of the three contingencies enumerated in § 6–101.40, but without the 'de novo' review features accorded tenured teachers.").  In *Isch*, in affirming the trial court's application of a clearly erroneous standard of review, the court held that "we discern no legislative intent in the plain language of §§ 6-101.40–101.47 governing the employment and non-reemployment of support employees to accord support employees the same guarantees of continued employment and/or 'de novo' review protections afforded tenured teachers." *Id.* at 21.  Most relevant to the arguments presented here, the court also stated that "a support employee on a year-to-year contract has no constitutionally protected property interest in continued employment in successive years." *Id.* (emphasis added) (citing *Brown*, 974 F.2d at 1240).

Based on Oklahoma case law, Murphy does not appear to be an "at will" employee because she can only be terminated for cause, lack of funds, or lack of work (rather than for no cause whatsoever) and because she is employed pursuant to a one-year renewable contract.  *See McCrady*, 122 P.3d at 475 (holding that "classified" employees under the Oklahoma Personnel Act, who were governed by specific rules and procedures and could not be terminated "without just cause," could not bring a *Burk* tort for wrongful termination); *Wilson*, 2009 WL 1564226, at *4 (holding that employee with one-year renewable contract was not at-will employee because he could be terminated only for cause during that period); *cf. Kester v. City of Stilwell*, 933 P.2d 952, 953 (Okla. Civ. App.

9

1997) (finding that police chief was an "at will" employee because city had right to terminate him at will and distinguishing employees with guarantees of  "good cause" or "cause" in their employment contracts).  However, the *Isch* case complicates this issue by stating that support employees have no constitutionally protected property interest in reemployment in successive years, despite that the amended version of the statute sets the same three conditions upon termination, demotion, *and* reemployment.  TPS has not argued that this statement in *Isch* is in error, nor has it factually distinguished *Isch* on grounds that Murphy was terminated during the term of her annual contract (instead of nonreemployed in a successive year).[8]  The Court finds that TPS has failed to sufficiently explain *Isch* or persuade the Court to issue a blanket holding that school district support employees may never bring a *Burk* claim, particularly because TPS has not conceded that such employees will always have an alternative remedy for violation of a constitutionally protected property interest.  Further, depending on TPS' explanation of and the Court's ultimate interpretation of *Isch*, a factual record may be necessary to determine when Murphy's contract expired in relation to her administrative hearings occurring in the summer of 2011.  Therefore, TPS' motion to dismiss the *Burk* claim is denied.

Based on the arguments presented, the Court will grant Murphy's request for leave to plead an alternative § 1983 claim for violation of her Fourteenth Amendment rights.  (*See* Resp. to TPS' Mot. to Dismiss 7 (requesting leave to amend if the Court finds that Murphy has a protected property interest in her employment).)  The Court will subsequently determine which alternative claim, if either, may proceed to trial.

---

[8] Perhaps TPS' position is that an individual who was nonreemployed in violation of public policy could bring a *Burk* claim, while Murphy could not because she was terminated during the life of her contract.

### C.      Punitive Damages

TPS seeks dismissal of any claim for punitive damages, arguing that Murphy cannot recover punitive damages on her § 1983 claim against TPS, on her § 1983 claim against Ballard in his official capacity, or for any tort claim arising under the Oklahoma Governmental Tort Claims Act ("OGTCA").

#### 1.      § 1983 Claim - TPS

Murphy may not recover punitive damages on her § 1983 claim asserted directly against TPS, as municipal agencies are immune from punitive damages under § 1983.  *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1307 (10th Cir. 2003) (explaining that § 1983 bars punitive damage awards against municipal agencies, including school districts).

#### 2.      § 1983 Claim - Ballard/Official Capacity

The availability of punitive damages on Murphy's § 1983 claim asserted against Ballard in his official capacity is less clear.  In *Youren*, a Tenth Circuit case directly on point and presenting similar facts, the court stated that "[t]he fact that municipalities are immune from punitive damages does not, however, mean that individual officials sued in their official capacity are likewise immune." *Id.* at 1296 (holding that whistleblower employee's evidence in support of her official capacity § 1983 claim against school official – which included  her "shin[ing] a light on unsavory and illegal practices" and then being ordered to undergo a psychological evaluation and threatened with termination – warranted a punitive damages instruction).  However, this holding in *Youren* has been called into question by lower courts.  *See Trevillion v. Glanz*, No. 12-CV-146-JHP, 2012 WL 4893220, at * 6 (N.D. Okla. Oct. 15, 2012) ("Although this language indicates some punitive award may be available in official capacity suits, it cites to no authority and runs counter to long-established

Supreme Court precedent.") (declining to follow *Youren* and dismissing punitive damage claim against sheriff sued in his official capacity under § 1983); *Riggs v. City of Owensville*, No. 10-CV-793, 2010 WL 2681384, at * 2-3 (E.D. Mo. July 2, 2010) ("[*Youren*] is not supported by reasoning or citation to authority and does not appear to have been followed even within the Tenth Circuit."). The Court will address this question at later stages of the proceedings, if necessary and after full briefing by the parties.  TPS' motion to dismiss any punitive damage claim arising from Ballard's official conduct is denied.

### 3.    Tort Claims

With respect to her state-law tort claims asserted against TPS under the OGTCA, Murphy may not recover punitive damages.  *See* Okla. Stat. tit. 51, § 154(C) ("No award for damages in any action or any claim against the state or a political subdivision shall include punitive or exemplary damages.").

## VI.    Motions to Dismiss of Spring, Wheeler, and Pruitt

Spring and Wheeler filed a joint motion to dismiss, arguing that Plaintiff's alleged facts do not state any plausible claims against them.  Pruitt filed a separate motion to dismiss, which presents similar arguments.  The motions are addressed together, but the Court has endeavored to address all arguments raised in both briefs.

### A.    § 1983 Claims - First Amendment

These Defendants argue that Murphy has failed to allege that she engaged in "citizen speech" or that they personally participated in the alleged First Amendment violation.

12

### 1. Citizen Speech

The Supreme Court has long recognized that "the government's interest in regulating the speech of its employees differs significantly from its interest in regulating the speech of the public in general." *Deschenie v. Bd. of Educ.*, 473 F.3d 1271, 1276 (10th Cir. 2007). When a citizen accepts public employment, "'the citizen by necessity must accept certain limitations on his or her freedom.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). In determining whether a public employer impermissibly retaliated against a public employee in violation of the employee's First Amendment rights, the Tenth Circuit has instructed courts to utilize a five-part test based on the Supreme Court cases of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *See Brammer-Hoelter,* 492 F.3d at 1202-03. The *Garcetti/Pickering* analysis requires the following steps:

> First, the court must determine whether the employee speaks pursuant to [his] official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created.[9] Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer. Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in [a] detrimental employment decision. Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

---

[9] The first step was added by the Tenth Circuit in 2007 based on the Supreme Court's decision in *Garcetti*. *See Brammer-Hoelter,* 492 F.3d at 1202.

*Id.* (internal citations and quotations omitted) (footnote added).  "The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact." *Id.*

These Defendants challenge whether Murphy's allegations satisfy the first element requiring citizen speech.  At the Rule 12(b)(6) stage, the only question is whether Murphy's allegations state a plausible claim that she was speaking as a citizen when she reported the misconduct rather than pursuant to her official duties.  Contrary to Defendants' argument, the fact that Murphy was speaking about something related to her employment does not entitle them to dismissal.  Instead, as in *Brammer-Hoelter*, the viability of Murphy's claim will turn on more detailed evidence regarding her job description, official duties, and the precise content and delivery of her speech. *See id.* at 1205 (holding that teachers' complaints regarding student behavior and curriculum were made pursuant to their official duties but that their complaints regarding other matters, such as spending and staffing, were not made pursuant to official duties) (analyzing several factors, including the teachers' official duties, job descriptions, and where and when the speech occurred).[10]

### 2. Personal Participation

These Defendants also argue that Murphy has failed to allege sufficient personal participation by them in the First Amendment violation, since Ballard and/or the Board ultimately made the demotion and termination decisions.  "Liability under § 1983 requires personal participation in the unlawful acts." *Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005).  However, "direct

---

[10]  Analysis of this prong generally requires analysis of facts and circumstances, *see id.* at 1204 (explaining that a court "must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship"); *Jones v. Osage Cnty.*, 06-CV-276-TCK, 2008 WL 410084, at * 5 (N.D. Okla. Feb. 12, 2008) (setting forth facts in Tenth Circuit cases and stating that such "cases demonstrate that . . . subtle factual differences can distinguish citizen speech from official duty speech"), and is better suited for summary judgment.

participation is not necessary," and "[a]ny official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279-80 (10th Cir. 2008). Under Tenth Circuit law, "[t]he requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.*

Murphy alleges that Spring, Pruitt, and Wheeler "conspired together for [her] termination" and then "suspended [her] employment and recommended her for termination" after she reported their illegal behavior. (Pet. ¶¶ 16, 20.) This is sufficient to allege "personal involvement" and a conspiracy by these three Defendants to set the termination process in motion. *See Miller v. City of Mission, Kan.*, 705 F.2d 368, 375 (10th Cir. 1983) ("The jury could have reasonably inferred from the trial record that defendant council members either directly participated in the termination process, or set in motion a series of events by others which they reasonably should have known would result in [the plaintiff's] dismissal without a hearing."); *cf. Beedle*, 422 F.3d at 1072 (affirming dismissal of § 1983 claims for lack of personal participation where the plaintiff "failed to allege any facts showing that [two of the defendants] participated in a conspiracy or acted improperly in any way").

In addition to the conspiracy to set the termination process in motion, Murphy alleges that all of these Defendants illegally accessed her personal email account and "used the emails and information obtained therefrom against [her] with respect to her termination." (*Id.* ¶ 20.) The alleged role that these three Defendants played in presenting evidence or otherwise persuading the decision-makers to demote or terminate Murphy could also potentially create a causal nexus to the First Amendment violation.

15

**B.      § 1983 Claims - Fourth Amendment**

These Defendants contend that Murphy's Fourth Amendment allegations are inadequately pled, fail to outline or explain how each particular Defendant violated the Fourth Amendment, and fail to state a reasonable expectation of privacy in her email account. These arguments can be summarily rejected. First, with respect to Murphy's failure to outline precisely what role each of these individual Defendants played in committing the alleged Fourth Amendment violation, a plaintiff will rarely if ever possess this type of information at the pleading stage. Murphy alleges that her three direct supervisors worked together to illegally access her private email account, and that the Tulsa Police Department contacted her to report the illegal activity associated with this account. She need not (and likely could not) know, prior to discovery, precisely how or in what manner the illegal activity was accomplished. Second, Murphy has adequately alleged that she had a reasonable expectation of privacy by alleging that it was a "personal" email account and that the Tulsa Police Department considered her a cyber-crime victim. The fact that her personal email account could be hacked from a school computer, or any other computer, would not seem to diminish a privacy interest therein, and Defendants cited no cases supporting this proposition. To the extent Defendants urge the Court to find that Murphy cannot satisfy a four-part "expectation of privacy" test that requires analysis of TPS policies, TPS' monitoring of the account, and third parties' right of access to the account (*see* Spring and Wheeler's Mot. to Dismiss 11), it is wholly premature to engage in such an analysis at the Rule 12(b)(6) stage.[11]

---

[11] If necessary, Murphy argues that she could amend her pleading to allege that she "had never accessed her personal email through a school computer or downloaded any information from [her personal email] account onto any school computer." (Resp. to Springer and Wheeler's Mot. to Dismiss 8.) The Court finds this additional pleading unnecessary.

**C.      § 1983 Claims - Article 2, § 22 of the Oklahoma Constitution**

Section 1983 claims may not be based on violations of state constitutional rights.  *See Rural Water Dist. No. 1, Ellsworth Cnty., Kan. v. City of Wilson, Kan.*,  243 F.3d 1263, 1275 (10th Cir. 2001) ("Section 1983 protects certain rights conferred by federal statutes."); *Dalton v. Cnty. Bd. of Comm'rs*, No. 94-3029, 1996 WL 102434, at *1 (7th Cir. Mar. 4, 1996) ("Any breach of a state created right is not redressable under § 1983.").  This aspect of Murphy's § 1983 claim must be dismissed.  Murphy conceded that this claim was improper but requested leave to amend to add a violation of this Oklahoma constitutional provision as a separate cause of action.  The Court finds such amendment to be in the interest of justice and therefore grants leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2).

**D.      ECPA Claims**

Spring and Wheeler move to dismiss the ECPA claim because Murphy failed to plead the inapplicability of an exception for interceptions "where one of the parties to the communication has given prior consent unless such communication is intercepted for the purpose of committing any criminal or tortious act."  18 U.S.C. § 2511(2)(d).  This argument fails because, as a general rule, a plaintiff's allegations "need not negative the matter of an exception.'"  *S.E.C. v. Jackson*, 908 F. Supp. 2d 834, 855-56 (S.D. Tex. 2012) (quoting *McKelvey v. United States*, 260 U.S. 353, 357 (1922)).  Instead, it "'is incumbent on one who relies on such an exception to set it up and establish it.'"  *Id.* (quoting *McKelvey*, 260 U.S. at 357) (also stating that "just because a statute has both affirmative defenses and exceptions does not automatically mean the plaintiff is understood to bear the burden of pleading and proving the inapplicability of an exception").  Further, even if such pleading was required, Murphy has alleged that the interception was for the purpose of committing

17

criminal or tortious acts – namely, having her terminated in violation of her First and Fourth Amendment rights.  If required, this would likely be sufficient to plead the inapplicability of this exception.

Pruitt argues that Murphy's allegations do not provide fair notice of "when, where and how" the ECPA violation occurred.  Pruitt further argues that Murphy has not pled "use" of the communications in a sufficient manner "to nudge [her] claim across the 'plausible' finish line." (Pruitt's Mot. to Dismiss 9-10.)  Pruitt's arguments also fail.  As to details of where and when, Murphy alleges that Pruitt, along with Spring and Murphy, illegally accessed her private email account sometime between June and August of 2011 in the scope of their TPS employment, and the Court finds this sufficient to provide fair notice.  As to "use," Murphy alleges that they used the emails in conjunction with and in support of Murphy's administrative review process.  Even assuming that "use" requires something beyond merely viewing the emails, *see Babb v. Eagleton*, 614 F. Supp. 2d 1232, 1245 n.9 (N.D. Okla. 2008) (explaining split among district courts in Tenth Circuit as to what constitutes "use" under ECPA), these Defendants allegedly presented the emails to TPS officials or otherwise "used" them to further their retaliation against Murphy.  This states a plausible "use" claim under the ECPA.[12]

---

[12]  Murphy argues that she could amend her pleadings to include specific details that were reported in the *Tulsa World* article attached as Exhibit B to her response.  These details include that, in late July 2011, a TPS campus police officer reported a possible violation of law by Spring, Wheeler, and Pruitt based on their accessing Murphy's personal email account.  The Court finds the current pleadings sufficient.  Further, there is no question that Pruitt had actual notice of the details regarding the "how, where, and when" of the ECPA claim, as they were publically reported.

### E.      OSCA Claims

Unlike its federal counterpart, the OSCA does not provide a civil remedy. *See* Okla. Stat. tit.

13, §§ 176.3 (providing criminal penalties for violations without discussion of civil remedies).  Thus,

these claims shall be dismissed.[13]

### F.      Invasion of Privacy/IIED[14]

 Oklahoma case law, adopting the Restatement (Second) of Torts, § 652A (1977), recognizes

the tort of invasion of privacy as falling into four categories: (1) unreasonable intrusion upon the

seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity

given to the other's private life; and (4) publicity that unreasonably places the other in a false light

before the public.  *McCormack v. Okla. Pub. Co.*, 613 P.2d 737, 740 (Okla. 1980); *Brill v. Walt*

*Disney Co.*, 246 P.3d 1099, 1102 (Okla. Civ. App. 2010).  This case implicates the first category –

an unreasonable intrusion into Murphy's private email account.  In cases involving an unreasonable

intrusion, a plaintiff must show: (1) the defendant intentionally intruded, physically or otherwise,

upon the solitude or seclusion of the plaintiff or his private affairs or concerns, and (2) the intrusion

would be highly offensive to a reasonable person.  *Munley v. ISC Fin. House, Inc.*, 584 P.2d 1336,

1339 (Okla. 1978) (adopting Restatement (Second) of Torts, § 652B)).

Murphy has alleged sufficient facts to state plausible claims for invasion of privacy and IIED.

First, for the same reasons explained above, the Court rejects Spring and Wheeler's argument that

Murphy has failed to adequately allege any reasonable expectation of privacy; her allegations of

---

[13] The Court *sua sponte* dismisses the OSCA claim asserted against TPS.  Murphy failed to respond to arguments related to the OSCA.

[14] The elements of an IIED claim are set forth *supra* Part IV and will not be repeated here.

expecting privacy in her personal, private email account are sufficient at this juncture.  Second, the

Court rejects Pruitt's reliance on this Court's decision in *Leslie v. Fielden*, No. 10-CV-320-TCK,

2011 WL 4005939, at * 4 (N.D. Okla. Sept. 8, 2011) (dismissing claims for IIED and invasion of

privacy against a mother who merely watched and transcribed certain videos from a recording device

planted by her husband and son).  Therein, the Court reasoned:

> The Court concludes that Karen's alleged conduct – which consists of transcribing
> and presumably watching surreptitious recordings taken by her husband and son – is
> not the type of outrageous and/or highly offensive conduct intended to be redressed
> by the above torts. In completing the alleged actions, Karen never came into contact
> with Leslie and never directed any conduct toward Leslie. She merely observed
> videos outside the presence of Leslie after they had been recorded and then
> transcribed them. Further, the recording device was placed in the living room,
> indicating that most footage watched by Karen was of a less private nature than had
> the camera been placed in a bedroom or bathroom.  Based on these facts, Karen's
> behavior of watching and transcribing the videos is not the type of intrusion that
> would be regarded as highly offensive to a reasonable person or the type of intentional
> conduct that is beyond the bounds of human decency. Therefore, Leslie's allegations
> against Karen fail to state a plausible claim for relief for the state law torts.

*Id.* at * 4.

Here, it is alleged that all three Defendants intentionally accessed Murphy's private email

account in order to garner evidence in support of their recommended termination, which was made

in retaliation for Murphy's whistleblowing on their illegal conduct.  Accessing another's private

account for the specific reason of garnering support for a wrongful termination could, depending on

all facts and circumstances and the specific role played by each Defendant, be deemed "highly

offensive to a reasonable person" for purposes of an invasion of privacy claim and/or "outrageous"

for purposes of an IIED claim.  It is certainly different than passively reading or watching a

communication that someone else illegally intercepted from the plaintiff.

## VII.    Conclusion

The School District Defendants' Motion to Dismiss Certain of the Plaintiff's Claims (Doc. 9) is GRANTED in part and DENIED in part as follows: (1) Defendant Board - granted; (2) Defendant Ballard - denied; (3) Defendant TPS - granted as to IIED, denied as to *Burk* claim, granted in part and denied in part as to punitive damages, granted *sua sponte* as to OSCA claim.

Defendants' Spring and Wheeler's Motion to Dismiss (Doc. 12) and Defendant Latricia Pruitt's 12(b)(6) Motion to Dismiss (Doc. 23) are GRANTED in part and DENIED in part.  Such motions are granted as to the OSCA claims and denied as to all other claims.

Murphy is granted leave to amend for the limited purposes of (1) adding a Fourteenth Amendment violation to her § 1983 claim, which is in the alternative to her *Burk* claim; and (2) adding a claim for violation of Article 2, § 22 of the Oklahoma Constitution.  The amendment must be filed no later than four days from entry of this Order.

SO ORDERED this 12th day of September, 2013.


**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**