## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CHERYL MURPHY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 13-CV-96-TCK-PJC** |
| | ) | |
| **(1) STEPHANIE SPRING, an individual,** | ) | |
| **(2) JON WHEELER, an individual,** | ) | |
| **(3) LATRICIA PRUITT, an individual,** | ) | |
| **(4) KEITH BALLARD, in his individual** | ) | |
| **and official capacities,** | ) | |
| **(5) INDEPENDENT SCHOOL DISTRICT** | ) | |
| **NO. 1 OF TULSA COUNTY, OKLAHOMA** | ) | |
| **a/k/a TULSA PUBLIC SCHOOLS, a state** | ) | |
| **governmental entity, and** | ) | |
| **(6) TULSA PUBLIC SCHOOLS BOARD** | ) | |
| **OF EDUCATION, a state governmental** | ) | |
| **entity,** | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court are the following pending motions: Defendant School District's Motion for

Summary Judgment (Doc. 69); Defendant Keith Ballard's Motion for Summary Judgment (Doc. 72);

Defendants Stephanie Spring and Jon Wheeler's Motion for Summary Judgment (Doc. 75); and

Defendant Latricia Pruitt's Motion for Summary Judgment (Doc. 77); Defendants Stephanie Spring

and Jon Wheeler's Motion to Strike Plaintiff's Damages, Claims, Witnesses, and Exhibits (Doc. 104)

and Motion to Strike by Defendants Tulsa School District and Dr. Keith Ballard (Doc. 106).

## I.    Factual Background

The following facts are either undisputed in the summary judgment record or construed in

favor of Plaintiff Cheryl Murphy ("Murphy"). Murphy was hired by Independent School District No.

1 of Tulsa County, Oklahoma ("TPS") as a support employee in 2000. After working as a support

employee at two middle schools from 2000-2004, she went to work as a support employee in the Education Service Center ("ESC"), where she supported the director of elementary and secondary curriculum and instruction. After this director retired, Defendant Dr. Stephanie Spring ("Spring"), the Director of Secondary School Student Activities and Athletics, approached Murphy about working for her, and Murphy agreed. Beginning in the 2004-2005 school year, Murphy was assigned the position of Director's Secretary for TPS Athletic Department. Her office remained in the ESC, and Murphy viewed herself as having worked her way up to this position.

From 2004 until Murphy's suspension on June 17, 2011, Spring supervised Murphy. Murphy also supported the two Assistant Athletic Directors, Defendants Jon Wheeler ("Wheeler") and Latricia Pruitt ("Pruitt"). On April 30, 2010, Spring gave Murphy a performance evaluation indicating Murphy met or exceeded expectations in ten different areas. There is no evidence that Murphy received any negative performance evaluations prior to June 2011.

A.      Pre-Suspension Reporting Activities - Spring/Early Summer 2011

Murphy contends that in the spring or early summer of 2011, she reported or attempted to report wrongdoing by Spring and/or Wheeler on several occasions. First, Murphy raised concerns about certain fabricated quotes and invoices with Spring herself. She alleges that, after raising these concerns, Spring and Wheeler were hostile toward her and stopped speaking to her for five weeks prior to her suspension. Second, she called Kevin Burr ("Burr"), TPS Assistant Superintendent, and left a message regarding Spring. Burr never returned her call. Third, she made a report to Dr. Pauline Harris ("Harris"), who held the position of TPS compliance officer.[1] In a meeting conducted

_____

[1] Murphy's brief indicates that this meeting took place on June 6, 2011, (*see* Murphy's Statement of Additional Fact No. 8), but the Court cannot locate such date in the record. Murphy testified that the meeting took place in the spring of 2011. In either event, the meeting

in Harris' office, Murphy told Harris that she was "being retaliated [against] for not agreeing to participate in situations that would put students in danger, things that were, I felt, unethical and illegal, and I wanted to file a complaint." (Murphy Dep. 68.) Murphy also told her that "I'm concerned that there's a target on my back, and they're not speaking to me"; that she could not "conduct business"; and that she wanted to "file what I found in the support employees handbook or online . . . I believe it was called a whistleblower complaint form." (*Id.* 69.)[2] More specifically, Murphy testified:

> Q.    Okay. So give me the Reader Digest version that you gave her. Tell the jury exactly what you told [Harris].
> A.    I don't know that I can recall exactly, but basically, I told her about the concussion legislation, that we were not in compliance. That I had raised the issue and was being told that it didn't matter. I felt it did matter. There were kids being put out on the football field that did not have physicals, did not have concussion forms, which was part of that state legislation that required us to have. And I told her that money was flying in all different directions. There was money being locked up in our storage room. There was money being kept in the desks of [Wheeler] and Dr. Spring. There was racial discrimination going on. There was - - I told her about the wall of shame which was in Dr. Spring's office. I voiced my concerns about bringing this to light to Dr. Spring and being basically turned on, if you want to use that term, or – that's basically the recap.

(*Id.* 69-70.) Fourth, Murphy made phone calls to the Oklahoma Education Association ("OEA") prior to her suspension. Finally, Murphy anonymously reported to TPD and TPS campus police that Spring had been drinking at an athletic event.

---

was before her suspension on June 17, 2011.

[2] Defendants have moved to strike Exhibit 7 to Plaintiff's response briefs, which is an undated document entitled "Whistleblower Complaint Form," due to the document's late production. The Court relies on Murphy's deposition testimony for purposes of summary judgment and will address the motion to strike at the pretrial conference.

On June 14, 2011, Spring submitted a "job target" to Bill Naftzger ("Naftzger"), TPS Director of Support Talent, which identified numerous problems with Murphy's performance including falsification of personnel records, chronic absenteeism, chronic tardiness, and insubordination. On June 17, 2011, Spring and Naftzger had a conference regarding the job target, and Naftzger determined that the facts justified Murphy's dismissal. In a confirmation email to Spring, Naftzger stated:

> In follow-up to our meeting today [June 17, 2011] with regards to Cheryl Murphy, this is to confirm that I have explained the following to you:
> - I have reviewed your Job Target report of June 14 to Ms. Murphy. Based on my review of the facts there are areas in the Job Target which justify Ms. Murphy's dismissal as opposed to a Job Target. Of particular concern to me is her repeated falsification of her personnel records.
> - I am also concerned with the information you gave me today that at the Job Target conference she was not only uncooperative but she even made the statement to you, "If you want to wage war with me then all gloves are off." I find this to be highly unprofessional and indicative of an employee who has no desire to work out issues with you. We quite simply cannot have employees like this.
>
> As a result, it is my belief, and it is my understanding after our discussion your belief, that Ms. Murphy should be suspended today and that dismissal proceedings should be initiated against her on Monday. Please confirm back with me, in writing, that you share this method of going forward.

(Ex. 17 to Pls.' Resp. to TPS' Mot. for Summ. J.) Spring confirmed that she agreed Murphy should be terminated.

**B.      Suspension - June 17, 2011**

On June 17, 2011, Gary Rudick ("Rudick"), chief of TPS' campus police department, delivered a letter from Naftzger to Murphy suspending her, ordering her off school property, and informing her that cause may exist for her dismissal. The suspension was with full pay and benefits. While packing personal items, Murphy made certain statements to Rudick, including that she would

fight her termination, that she had talked to the OEA and an attorney, and that she knew all of Spring's dirty little secrets. Rudick reported Murphy's statements to Doug Mann, one of TPS' attorneys, and copied Spring and Burr.

### C. First Recommendation for Termination - June 20, 2011

On June 20, 2011, Naftzger sent a "Termination Hearing Notice" to Murphy's home via certified mail. The notice states that Spring recommended termination based on Murphy's violation of ten different TPS rules. The notice states that a hearing would be held by the Tulsa School District Suspension, Demotion and Termination Review Committee ("Committee") on June 29, 2011. If the Committee voted to terminate, demote, or take other disciplinary action, then the Committee would submit such recommendation to the TPS Board of Education ("Board"). Prior to any final action by the Board, Murphy would have the right to a due process hearing if she requested it.

### D. Discovery of Illegally Obtained Emails - July 8, 2011

On July 8, 2011, John Priddy ("Priddy"), one of TPS' attorneys, met with Spring, Wheeler, and Pruitt in preparation for Murphy's due process hearing. (TPS' Statement of Fact 6.)[3] During this meeting, Spring revealed that she had obtained copies of emails from Murphy's private Yahoo email account. Priddy viewed at least one email during this meeting but then refused to view the rest. On or around July 21, 2011, Priddy informed TPS Superintendent Dr. Keith Ballard ("Ballard") about the emails, and Ballard requested that the Tulsa Police Department ("TPD") conduct an investigation into Spring, Wheeler, and Pruitt's activity. TPD conducted a forensic examination of Spring,

---

[3] Neither party explained whether the Committee hearing occurred on June 29, 2011. However, the parties were preparing for a due process hearing before the Board scheduled for August 16, 2011, indicating that the Committee recommended termination.

Wheeler, and Pruitt's computers and concluded that Spring and Wheeler had both accessed Murphy's private email account after Murphy's suspension. They viewed twenty-six of Murphy's private emails.

### E.  Withdrawal of Recommendation for Termination/First Reassignment - August 10, 2011

On or around August 10, 2011, Ballard sent the following letter to Murphy:

> I am withdrawing the recommendation for your dismissal effective immediately. You are to report to Ms. Sue Ann Bell located at Plant Operations on Monday, at 8:00 a.m. August 15, 2011. You will hold the position of Director's secretary, grade CA-10. your status, salary, benefits and hours per day and contract length will be the same as your previous position. At the next payroll period you will be paid all pay and benefits you may have lost as a result of the decision of the suspension review committee. If you have any questions as to the details of your reassignment, please contact Mr. Bill Naftzger.

> It has been reported to me by the School District's legal counsel that you have evidence that certain individuals may have committed improper or illegal acts as Tulsa School District employees. As an employee of the District you have a duty to provide me with all such information. Accordingly, I am instructing you to turn over any evidence of wrongdoing including copies of all documents and orally report all evidence of which you are aware to Mr. John Priddy so that a sufficient and complete investigation can be conducted concerning these activities. As the Superintendent of Schools, I can assure you that I will take appropriate action against any culpable employees upon the completion of the investigation.

(Murphy Dep., Ex. 19.)[4]

In the first paragraph of the letter, Ballard (1) withdrew the recommendation for termination, (2) informed Murphy she would be maintained as grade CA-10 "Director's Secretary" at the same salary and benefits, and (3) reassigned her to Maintenance and Plant Operations under Sue Ann Bell ("Bell"). Ballard testified that he withdrew his recommendation for termination because the

---

[4] This letter is undated. Based on a response letter from Murphy's attorney, the record construed favorably to Plaintiff indicates the letter was sent on or around August 10, 2011.

accessing of Murphy's private emails compromised the fairness of her due process hearing, not because he discounted or ignored Spring's original allegations against Murphy:

> . . . I'm going to say we're not going to go forward with this termination. But there were a lot of other allegations and there was a lot being said at that time. And, specifically, Ms. Murphy was being recommended for termination due to chronic absenteeism. There was a whole laundry list of issues that may that may have stood up. So it's not that she was the most stellar employee, but I could not go through with the termination knowing what I knew about the computer. So I made the decision to return her to full employment in the district and, if you will, give her a fresh start.

(Ballard Dep. 60-61.) When asked why he did not reassign Murphy to her former position in the athletic department or another open position in the ESC, Ballard stated that he "did not see a placement in the [ESC] as being appropriate" and therefore instructed Naftzger to place her elsewhere but at the same salary and grade. (*Id.* 111.) When asked why such an assignment would not be appropriate, Ballard stated "[b]ecause there had been action brought against her for work-related issues." (*Id.*)

In the second paragraph of the letter, Ballard ordered Murphy to "turn over any evidence of wrongdoing" to Priddy. At first blush, it appears this letter could be referring to Murphy's knowledge of any illegally accessed emails. However, Ballard testified that he was referring to allegations of other improper or illegal conduct of which he had become aware through media reports.

> Q:     And what's going on in this second paragraph?
> A:     . . . It was during this time that it began to come to my attention. And I don't remember if it was exactly here that I saw it on television or when that specifically Ms. Murphy was making allegations of improper or illegal acts. And if she had that information, I wanted it immediately.

(*Id.* 79-80.) Ballard also testified:

> Q:     Well, what other allegations other than the computer allegations did you want investigated?

A:      Well, you know, I had been seeing – hearing on television and through other venues that Ms. Murphy was raising allegations about improprieties in the athletic department and that concerned me greatly.

(*Id.* 58.)[5]

By August 10, 2011, Murphy had hired legal counsel, Richard O'Carroll ("O'Carroll"). O'Carroll responded to Ballard's letter, indicating that reassignment 1 was deemed to be a demotion. As to reassignment 1, the undisputed facts show that (1) Bell already had a secretary at this time, and Murphy would simply be "assisting" that secretary, (2) the job was located somewhere other than the ESC[6], and (3) the job description for Bell's secretary, whom Murphy would merely be assisting, had significantly fewer responsibilities than Murphy's support position for the athletic department. At some point, O'Carroll informed Priddy that, in addition to reassignment 1 being a demotion, it was unacceptable due to a conflict created by Bell and Spring's personal friendship. Murphy never reported for reassignment 1.

## F.      Recorded Statement - August 19, 2011

On August 19, 2011, accompanied by O'Carroll, Murphy gave an unsworn recorded statement. O'Carroll led Murphy through a set of "whistleblowing" documents she compiled, and Priddy asked Murphy follow-up questions. Murphy accused Spring of numerous types of misconduct, including fabricating invoices, taking kickbacks from sporting goods stores, engaging in and permitting overtly sexual conduct in the workplace and at school events, drinking and providing alcohol to others at school events, receiving double compensation for attendance at school

---

[5] Curiously, Murphy has not asserted that she made any reports to the media, and no such reports form the basis of her First Amendment retaliation claim.

[6] According to Murphy, it is widely known that support jobs at the ESC are desired, while support jobs at other locations are less desired.

events, and not complying with certain "concussion" laws and policies governing student athletes. Wheeler and Pruitt were also implicated by some of Murphy's allegations.

### G. Second Reassignment - September 15, 2011

On Thursday, September 15, 2011, Priddy responded to O'Carroll's August 10, 2011 letter. Priddy stated that, although TPS did not find any conflict created by Spring and Bell's friendship, TPS would reassign Murphy to the Transportation Center, at the same grade level and pay. The letter ordered Murphy to report to Roslyn Vann-Jackson ("Jackson") the following day, on Friday, September 16, 2011. As with the first reassignment, it is undisputed that (1) Jackson already had a secretary, and Murphy would simply be "assisting" that secretary, (2) the job was located somewhere other than the ESC,[7] and (3) the job description for Jackson's secretary, whom Murphy would merely be assisting, had significantly fewer responsibilities than Murphy's support position for the athletic department.

On Monday, September 19, 2011, at 12:45 p.m., O'Carroll sent Priddy an email stating that he was unable to speak with Murphy until the weekend due to other business. O'Carroll then rejected TPS' "offer" of the second reassignment on Murphy's behalf, stating:

> Apparently you are offering the Siberia of TPS . . . . This is the place employees are sent before they are terminated. You have frozen my client out for 90 days without pay while she is suffering the pain and humiliation of her termination without cause.[8] You have further coddled the malfeasants, and by doing so, sent a clear and unequivocal message that my client is the trouble maker. No gentlemen, your offer is not acceptable. My client is still at risk while Spring and her posse are empowered.

---

[7] Murphy claims the transportation center is commonly known as the "bus barn" and is not a desirable support assignment.

[8] Murphy has not argued or presented evidence that there was any time prior to her termination on December 12, 2011 that she was not paid her salary. The correspondence indicates there was no break in her salary, and this statement by O'Carroll appears to be in error.

. . . At a minimum, you should have reinstate [sic] my client at a similar position at
the Education Service Center to establish my client is to be respected.

(Pl.'s Resp. to TPS' Mot. for Summ. J., Ex. 21.)  Murphy never reported to work for reassignment

2.

### H.      Second Recommendation for Termination - September 19, 2011

On the same date as O'Carroll's email, which was the Monday following Murphy's failure

to report for reassignment 2 on Friday, Murphy received a hand-delivered letter from Naftzger

informing her that he was again recommending her for termination.  This time, the letter listed only

two violations – unexcused failure to be at work station at starting time and unexcused absenteeism.

Naftzger stated:  "You have been absent since September 6 and have not requested a leave of

absence, nor have you called in and reported your absences on a daily basis.  You have been a no

call/no show for more than three consecutive days."  (Pl.'s Resp. to TPS' Mot. for Summ. J., Ex. 9.)

The letter set forth the same process explained in the first recommendation for termination: (1) a

hearing by the Committee at which Murphy could be present and represented; and (2) if termination

or another demotion was recommended, a due process hearing before the Board upon request.

### I.      Spring, Wheeler, and Pruitt's Suspension - November 15, 2011

Ballard suspended Spring, Wheeler, and Pruitt on November 15, 2011.  Shortly thereafter, on

November 28, 2011, Ballard (1) reinstated Pruitt to her former position as assistant athletic director,

and (2) notified Wheeler of his recommendation to the Board that Wheeler be dismissed and

informed Wheeler of his right to a hearing.   These decisions were based on Burr's written

recommendations to Ballard, which summarized TPS' and TPD's investigations into these two

employees' participation in accessing Murphy's private email account.  Spring remained suspended,

but no decision regarding Spring's employment was made at this time. Spring was apparently being investigated for additional violations, including embezzlement of public funds.

**J.      Murphy's Due Process Hearing - December 12, 2011**

On December 12, 2011, the Board held Murphy's due process hearing on the second recommendation for termination. During the hearing, the Board limited Murphy's evidentiary presentation, only allowing her to present evidence regarding her reasons for not reporting for the two reassignments. Murphy's new counsel, Mr. Stephen Peters ("Peters"), was not allowed to mention Spring's name or put on evidence regarding the original suspension, which resulted from the allegedly retaliatory job target initiated by Spring. The following exchange is indicative of the limited nature of the hearing:

| | |
|---|---|
| Q [Peters]: | Are you not understanding my question? She lost her original position because of what an old supervisor alleged, correct? |
| A [Naftzger]: | Yes. |
| Q: | Do you have an opinion as to whether or not what the old supervisor said was wrong and wronged my client? |
| Mr. Priddy: | I am going to object. We've been down this road previously when we addressed the original recommendation. That's not why we're here. And I would ask that the – Mr. President, that you direct counsel if he could just limit this presentation as the state Board of Education has told us, that the only evidence that should be admitted is evidence which reasonably relates to the issues before the Board as reflected in the notice. And the notice of why we're here is her failure to report to work. So I would just ask that we limit it to that information. |
| Mr. Hunt: | Mr. Peters? |
| Mr. Peters: | I don't think you can fairly or equitably limit this to the no call/no show when none of this ever would have happened absent these allegations by this supervisor which turned out to be wrong or Dr. Ballard would not have offered reinstatement to begin with. And this is your human resources person, and I'm just asking him, you know, the point is, but for the original misdeeds by someone else, are we even here tonight, and I don't think we are. |

| | |
|---|---|
| Mr. Hunt: | Mr. Peters, I'm not going to agree to that. I believe Mr. Priddy pointed out the notice that we're here tonight related to her reassignments and her not showing up, and so that's where the questions need to be focused. |
| Mr. Peters: | I'll ask one final question. Absent the allegations by her old supervisor, would she have been reassigned? |
| Mr. Priddy: | Same objection. (Inaudible) |
| Mr. Priddy: | I have no further questions. |

(Tr. of 12/12/11 Due Process Hr'g at 45:3-46:11, TPS' Mot. for Summ. J., Ex. 5.) After being prevented from putting on letters from O'Carroll explaining why Murphy did not report for the assignments, Peters further argued that "later on down the line . . . there can be an argument for due process." (*Id.* 43:19-23.)

Following executive session, Board member Anna America ("America") moved to make seven findings of fact, all of which related to Murphy's failure to report for the reassignments. America then moved to terminate Murphy, and motion was seconded and passed. America and the other Board members submitted affidavits in this case stating that their decision to terminate Murphy "was not in any way motivated by any statement Cheryl Murphy had made about possible misconduct in the school district's athletic department." (*See* TPS' Mot. for Summ. J., Ex. 6.)

### K.    Recommendation for Termination of Spring - January 3, 2012

Based on a written recommendation by Burr discussing the investigation into Spring, Ballard notified Spring of his recommendation for her dismissal on January 3, 2012.

### L.    Murphy's Petition - December 14, 2012

In her Petition filed in state court on December 14, 2012, Murphy alleged the following causes of action: (1) violation of 42 U.S.C. § 1983, premised on violations of her First and Fourth Amendment rights and article 2, § 22 of the Oklahoma Constitution, asserted against all Defendants; (2) civil damages claim for violation of Title II of the Electronic Communications Privacy Act of

1986 ("ECPA"), Pub. L. No. 99–508, 100 Stat. 1848, asserted against Spring, Wheeler, Pruitt, and TPS;[9] (3) violation of the Oklahoma Security of Communication Act ("OSCA"), asserted against Spring, Wheeler, Pruitt, and TPS; (4) invasion of privacy, asserted against Spring, Wheeler, Pruitt, and TPS; (5) intentional infliction of emotional distress ("IIED"), asserted against all Defendants; and (6) *Burk* tort for termination in violation of public policy, asserted against TPS and the Board.[10] Murphy's claims were asserted against Ballard in his individual and official capacities, but were asserted against Spring, Wheeler, and Pruitt in their individual capacities only.

## M.    Spring's Federal Conviction - March 25, 2013

At some point, TPS' internal investigation of Spring led to a grand jury subpoena, which led to a federal criminal investigation of Spring.    On March 25, 2013, Spring pled guilty to misapplication of government funds, in violation of 18 U.S.C. § 666(a)(1)(A).  Rudick testified in his deposition in this case that Murphy did not report the specific type of embezzlement forming the basis of Spring's federal conviction, stating that "[Murphy's] allegations were vague and that something wasn't right; that things were not being done properly."  (Rudick Dep. 74:1-6.)

## N.    Court's Rulings on Motions to Dismiss - September 12, 2013

On September 12, 2013, the Court ruled on pending motions to dismiss.  With respect to TPS and Ballard, the Court: (1) dismissed the Board as a separate defendant; (2) permitted the IIED claim to proceed against Ballard individually; (3) dismissed the IIED claim against TPS; (4) denied TPS'

---

[9]  The Court's prior Order stated that Murphy alleged a violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, and that such act was "also known as" the ECPA.  This statement is imprecise, and the First Amended Complaint is also imprecise.  The Court construes and clarifies this cause of action *infra* Part III.F.

[10]  This tort is based upon the Oklahoma Supreme Court's decision in *Burk v. K-Mart Corporation*, 770 P.2d 24 (Okla. 1989).

motion to dismiss the *Burk* claim but also permitted Murphy to file an Amended Complaint asserting an alternative Fourteenth Amendment due process violation;[11] (5) dismissed any punitive damages claim against TPS; (6) denied the motion to dismiss any punitive damages claim against Ballard in his official capacity but stated that it would address this issue, if necessary, at later stages of the proceedings. With respect to Spring, Wheeler, and Pruitt, the Court: (1) denied their motion to dismiss § 1983 claims premised on First and Fourth Amendment violations; (2) dismissed Murphy's § 1983 claim premised on violation of article 2, § 22 of the Oklahoma Constitution but permitted amendment to add this claim as a separate cause of action; (3) denied Spring and Wheeler's motion to dismiss the ECPA, IIED, and invasion of privacy claims; and (4) granted all motions to dismiss the OSCA claims based on the absence of a private remedy. After a lengthy period of discovery, Defendants filed the currently pending motions for summary judgment.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient

---

[11] The Court stated that it would subsequently determine which alternative claim, if either, should proceed.

to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

### III.     TPS' Motion for Summary Judgment[12]

TPS moves for summary judgment on all three § 1983 claims: (1) First Amendment retaliation claim, which relates to Murphy's speech against Spring and subsequent adverse employment actions; (2) Fourth Amendment claim, which relates to Spring, Wheeler, and Pruitt accessing Murphy's personal email account; and (3) Fourteenth Amendment claim, which relates to whether Plaintiff received meaningful process prior to her termination. TPS also seeks summary judgment on the ECPA claim, the Oklahoma constitutional claim, the invasion of privacy claim, and the *Burk* claim.

### A.     § 1983 - First Amendment

The Supreme Court has long recognized that "the government's interest in regulating the speech of its employees differs significantly from its interest in regulating the speech of the public in general." *Deschenie v. Bd. of Educ.*, 473 F.3d 1271, 1276 (10th Cir. 2007). When a citizen accepts public employment, "'the citizen by necessity must accept certain limitations on his or her freedom.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). When faced with a First Amendment claim by a public employee, "courts must balance the First Amendment interests of that employee, speaking as a concerned citizen, with the government's interests in promoting the efficiency of the public services it performs through its employees." *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1227 (10th Cir. 2014).

---

[12] The Court's analysis of claims against TPS also applies to any claims asserted against Ballard in his official capacity.

To conduct this balancing, courts utilize a five-part test based on the Supreme Court cases of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *See Brammer-Hoelter*, 492 F.3d at 1202-03. The *Garcetti/Pickering* analysis requires the following steps:

> First, the court must determine whether the employee speaks pursuant to [his] official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer. Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in [a] detrimental employment decision. Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Id.* (internal citations and quotations omitted). "The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact." *Id.*

TPS contends that Murphy's claim fails because she spoke pursuant to her duties as an employee, not as a private citizen; her speech was not a substantial or motivating factor in her termination by the Board; and TPS would have terminated Murphy even if she had not spoken, as evidenced by the affidavits of Board members.

### 1.     Detrimental Employment Decisions

Prior to addressing TPS' arguments, some discussion of the "detrimental employment decision" element is necessary. "An employee alleging [First Amendment] retaliation must show that his employer took some adverse employment action against him." *Baca v. Sklar*, 398 F.3d 1210,

16

1220 (10th Cir. 2005). The "detrimental employment decision" standard in the First Amendment retaliation context is less strenuous than the "adverse employment action" standard in the Title VII context. *See id.* ("[A] public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII."). For example, the Tenth Circuit found the following employment decisions could constitute impermissible retaliation: (1) removal of job duties, (2) a job reprimand, (3) a poor performance evaluation, and (4) an involuntary transfer to another facility, although with the same title and responsibilities. *See Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir. 1999).

With this relaxed standard in mind, the Court rejects TPS' repeated attempts to characterize Murphy's final termination as the only relevant detrimental employment decision. This would unfairly limit the scope of Murphy's claims and ignore other possible detrimental employment decisions that occurred prior to her ultimate termination in December 2011. Based on the above standards, the summary judgment record establishes four potential detrimental employment decisions: (1) the job target, which is akin to but more severe than a poor performance evaluation, (2) the suspension, (3) the reassignments, and (4) the termination.

### 2. Citizen Speech

The Court must determine whether, prior to any of these four relevant decisions, Murphy engaged in any speech as a citizen, or whether all speech was pursuant to her official duties. *See Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010). The Tenth Circuit takes "a broad view of the meaning of speech that is pursuant to an employee's official duties," and, therefore, the first prong presents a "heavy barrier" for Murphy to overcome. *Id.* There is no "formula for determining when a government employee speaks pursuant to his official duties," and

courts have resisted setting bright-line rules. *Id.* Instead, courts take a case-by-case approach, "looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Id.* Generally, courts focus on whether the speech "stemmed from and [was of] the type . . . that [the employee] was paid to do." *Id.*; *see also Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 798 (10th Cir. 2007) ("[T]he crux of our inquiry is whether [the plaintiff's] activities in arranging for a confirmation test were pursuant to her duties as a drug lab technician."). Another relevant consideration is whether the report was within or outside the employee's "chain of command." *See Rohrbough*, 596 F.3d at 747. The "ultimate question in determining whether speech falls within an employee's official duties is whether the employee speaks as a citizen or instead as a government employee." *Id.* (internal quotations omitted). In resolving this question of law, the Court must "review disputed facts relevant to step one of the *Garcetti/Pickering* analysis in the light most favorable to the non-moving party at the summary judgment stage." *Id.* at 746.

As the starting point for its analysis, the Court must "determine what speech and conduct is at issue" and then "examine [the employee's] job description." *Green,* 472 F.3d at 799-800. Construing the record favorably to Murphy, Murphy identified and explained six potential instances of speech: (1) report to Spring regarding fabricated invoices; (2) report to Harris regarding numerous problems in the athletic department; (3) report to Burr via phone message; (4) anonymous report to TPS campus police and TPD regarding Spring drinking at a school event; (5) communications with OEA; and (6) recorded statement on August 19, 2011.[13]

---

[13] TPS focuses exclusively on the recorded statement, and its briefing was therefore unhelpful with respect to Murphy's other identified instances of speech.

Murphy's job description, as set forth in TPS' documents, includes forty-four essential functions, including creating and maintaining all athletic schedules for high schools and middle schools; processing payroll; corresponding with TPS sites; implementing the driver's education program; collecting and then distributing student athletes' physicals and insurance forms to school sites; processing all requisitions; and coordinating several specific TPS events. Nothing requires Murphy to ensure compliance with laws or prevent fraud or embezzlement.

### a.    Report to Spring

Murphy's internal report to Spring was made privately, was clearly within Murphy's chain of command, and was aimed at correcting problems within the department. This type of internal reporting directly up the chain of command, made in an effort to improve problems identified by Murphy in performing her duties, is clearly more akin to "official duty" speech than "citizen" speech. *See Rohrbough*, 596 F.3d at 747 ("[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties . . . ."); *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007) ("We have consistently held that complaints up the chain of command about issues related to an employee's workplace duties – for example, possible safety issues or misconduct by other employees – are within an employee's official duties.").

### b.    Report to Harris

At some point, Murphy became concerned she had a "target on her back." She then made an official report to Harris, the TPS official to whom her handbook instructed her to report retaliation and misconduct by her supervisors. This speech was no longer for the purpose of correcting problems within her department; it was for the purpose of reporting wrongdoing by a high-level TPS official and attempting to protect herself from unfair retaliation by Spring.

This report presents a more difficult question. The report to Harris was akin to citizen speech because Harris was not within Murphy's "chain of command" at TPS; instead, Harris is the first stop for a TPS whistleblower. Further, Murphy's internal report to Harris was not made in the course of performing any of her enumerated job functions as the athletic department secretary. Murphy was not a high-level employee expected to oversee others or ensure the integrity of the department. In fact, her report to Harris was arguably contrary to her official duties of assisting and supporting Spring, who told Murphy there were no problems with the way she handled funds. The facts are therefore distinguishable from cases where internal reports of wrongdoing fell within the scope of that employee's job duties. *Cf. Garcetti*, 547 U.S. at 1959-60 (deputy district attorney's memorandum to his supervisors regarding problems in search warrant was not protected because he was speaking as a "prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case"); *Williams*, 480 F.3d at 694 (concluding that athletic director's internal memoranda to an office manager and principal, which was not required by his job description, was nonetheless written in the course of performing official duties); *Rohrbough*, 596 F.3d at 748 (hospital transplant coordinator's complaints to co-workers and observations in written "occurrence reports" regarding understaffing and unsafe conditions were unprotected because, while the speech was not required by her job, it was made pursuant to her "official duties" as the transplant coordinator); *Casey*, 473 F.3d at 1334 (superintendent's statements to school board and federal officials were unprotected because they "implicated responsibilities she held by virtue of her administration of a federally funded program"); *Duvall v. Putnam City Sch. Dist., Indep. Sch. Dist. No. 1 of Okla. Cnty.*, 530 F. App'x 804, 814-15 (10th Cir. 2013) (unpublished) (special education teacher's speech to supervisors and parents and "letters of dissent" aimed at ensuring compliance with state and federal

law were unprotected because "part of her responsibility as a special education teacher was to ensure compliance with state and federal law").

On the other hand, Murphy's report to Harris was entirely "internal," meaning it was in a private meeting with one TPS official, rather than to a newspaper, legislature, or outside agency. Although not dispositive, *see Williams*, 480 F.3d at 694 n.1, this certainly weighs against a finding that Murphy was speaking as a "citizen" as opposed to a TPS employee. *See Casey*, 473 F.3d at 1334 (reasoning that speech was unprotected in part because it was made at public meeting); *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324-25 (10th Cir. 2008) (building inspector's report to Oklahoma State Bureau of Investigation was protected citizen speech because it was beyond his general job duties and made to an outside agency). Only a TPS employee, and not an ordinary citizen, has the occasion and ability to report to Harris, which weighs against a finding of protected speech. *See Rohrbough*, 596 F.3d at 746 (interpreting *Garcetti* to suggest that speech is not protected when there is "no relevant analogue to speech by citizens who are not government employees"). Perhaps most importantly, although the report was not required by Murphy's specific job functions, it was required by a general policy imposed upon all TPS employees to report wrongdoing. The TPS "Whistleblower Protection/Anti-Retaliation" policy provides:

> It is important that the District be promptly notified of unlawful or improper behavior including, but not limited to, any of the following conduct:
> * Harm or potential harm to students
> * Theft of property or embezzlement or misuse of funds
> . . .
> Any employee of the District who has a reasonable, good faith belief or suspicion about any of the above conduct *shall promptly report* the conduct to the District. The District values this input and each employee should feel free to make such reports without fear of retaliation.

(Murphy Dep. at Ex. 7.) This policy also weighs against a finding of citizen speech, since Murphy's report was mandated by TPS policy.

Although it is a close question, the Court concludes Murphy was speaking more as a governmental employee than as a concerned citizen when she reported to Harris because (1) the report was made internally to a TPS official; (2) the report was mandated by TPS policy; and (3) Murphy was reporting retaliation that she had already experienced and was trying to avoid being unfairly targeted by her supervisors, rather than merely reporting wrongdoing as a general citizen or taxpayer seeking to expose wrongdoing. It seems a bizarre result that Murphy's speech is denied protection because she followed TPS policy and reported wrongdoing through internal channels rather than going straight to the media or an outside agency. However, this is the result of *Garcetti* and the Tenth Circuit's interpretation thereof. *See* Raj Cohen, *Tenth Circuit Interpretations of Garcetti: Limits on First Amendment Protections for Whistleblowers*, 85 Denv. U. L. Rev. 573, 594 (2008) ("Ironically, the *Garcetti* rule appears to have created a perverse incentive that encourages government employees to take their problems first to the media, or any authority outside of the employee's immediate chain of command. This is because a government employee who tips off a newspaper reporter about government corruption is more likely to have engaged in constitutionally protected speech than the government employee who reports the same corruption through official government channels.") (explaining that *Garcetti* results in diminished protection for whistleblowers and incentivizes "specific directives that employees are to funnel all complaints and concerns relating to possible fraud, mismanagement, waste, and criminality to appropriate internal channels" rather than to outside sources). Therefore, the internal report to Harris cannot be considered "citizen speech."

### c.        Report to Burr

The internal "report" to Burr was one unreturned voicemail message, and Murphy has presented little information about the contents of that message. The Court does not have sufficient information to analyze the content of the speech. In addition, it would not qualify for citizen speech for the same reasons set forth above regarding the more detailed report to Harris.

### d.        Report to TPS Police and TPD

Murphy reported anonymously that Spring had been drinking at a school event to the TPS campus police and the TPD. This external report was not made pursuant to Murphy's official duties. However, there is no evidence that TPS officials knew about this report or knew that Murphy made the report. It therefore cannot form the basis of Murphy's retaliation claim.

### e.        Communications with the OEA

In her statement of facts, Murphy contends that she "contacted the [OEA] to report the mishandling of school funds and reported racial and sexual harassment and drinking on the job." (Pl.'s Resp. to TPS' Mot. for Summ. J., Statement of Additional Fact No. 10.) However, the depositions cited simply do not support this contention. Murphy never explains what information she gave to OEA. The scattered references to the OEA in Murphy's deposition arise from Rudick's email informing TPS that Murphy mentioned contacting the OEA while she was collecting her personal belongings. There is no information, however, regarding what she said to the OEA. The record also references certain written communications between Murphy and the OEA that were accessed from her Yahoo email account. However, Murphy has not submitted such emails or provided evidence of precisely what those communications contained. Murphy must provide

evidence of the content of the allegedly protected speech in order to survive summary judgment, and she has failed to do so with respect to any OEA communications.

## f.      Recorded Statement

Unlike the internal report to Harris, which was instigated by Murphy herself, the recorded statement was ordered by Ballard in his August 10, 2011 letter and then scheduled by the parties' attorneys, O'Carroll and Priddy. In addition to being ordered by Ballard, the recorded statement was also mandated by the TPS policy identified above.  In case there was any doubt as to how Murphy and her counsel viewed this recorded statement, O'Carroll stated on the record that Murphy was required to provide the information to TPS.  (*See* Tr. of 12/12/11 Due Process Hr'g 3:23-25, Murphy Dep. at Ex. 28 ("We do take the position we are required to give it to you, we are giving it to you, and this is assistance.").)  Although Murphy was suspended when she gave the statement, she was still employed by TPS and was still trying to save her job.  The recorded statement was therefore provided within the scope of Murphy's official duties and is not protected.  *See Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544-45 (10th Cir. 2007) (holding that employee's speech to agent hired by government employer to evaluate department was not protected because such speech was ordered by employee's supervisors) (acknowledging but dismissing lower court's policy concern that employers could order speech and then use it against an employee without constitutional concern).

Murphy's First Amendment retaliation claim fails because she cannot demonstrate that she engaged in speech as a citizen, and judgment is granted in favor of TPS.  The Court does not reach TPS' arguments regarding the fourth and fifth elements.

## B.    Article 2, § 22 of Oklahoma Constitution

Murphy asserts a similar claim against TPS arising under article 2, § 22 of the Oklahoma Constitution, which provides that every person "may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right." Okla. Const. Art. 2, § 22. Ordinarily, this provision is invoked as a public policy supporting a *Burk* tort claim for wrongful discharge, rather than a stand-alone claim. *See, e.g., Dixon v. Okla. Bd. of Veterinary Med. Examiners*, No. CIV-06-1003-M, 2009 WL 1473973, at *2 (W.D. Okla. May 26, 2009). In this case, however, Murphy cannot assert a *Burk* tort because she was not an at-will employee. *See infra* Part III.D.

In cases where the constitutional provision has been invoked as a stand-alone claim, courts have held that it may not proceed to trial simultaneously with a § 1983 First Amendment retaliation claim. *See Underwood v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson*, 611 F. Supp. 2d 1223, 1234 (W.D. Okla. 2009) ("Inasmuch as the Court has determined that factual disputes preclude summary judgment on his § 1983 claim, . . . the continued pursuit of his state constitutional claim could present a potential double recovery situation in the event [the plaintiff] prevails at trial.") However, the duplicative remedy argument does not apply here because the Court granted summary judgment on the § 1983 claim. In addition, the Oklahoma Supreme Court has held that the Oklahoma Constitution provides *broader* protection of free speech rights than the First Amendment of the U.S. Constitution. *In re Initiative Petition No. 366*, 46 P.3d 123, 127 (Okla. 2002); *Brock v. Thompson*, 948 P.2d 279, 288 n.33 (Okla. 1997). Thus, the Court may not simply rely upon its *Garcetti/Pickering* analysis to evaluate this claim.

In support of its motion for summary judgment on this claim, TPS argues only that Murphy's speech was not a motivating factor in her termination. (*See* TPS' Mot. for Summ. J. 23.) The Court

rejects this factual argument for two reasons.  First, the termination is not the only relevant adverse employment decision.  The job target, the suspension, the reassignments, and the termination could all be viewed as distinct adverse employment decisions, or they could be viewed as one prolonged adverse employment decision culminating in a termination.  Second, questions of fact exist as to whether any of these decisions were motivated in part by Murphy's speech (assuming the Oklahoma Constitution would protect such speech).  With respect to the job target completed by Spring and resulting suspension, these events occurred close in time to Murphy's reports to Spring and Harris and could certainly be viewed as retaliation.  With respect to the reassignments and second recommendation for termination, Ballard admitted that the job target and ensuing investigation influenced his decision not to reassign her to her former job or to another more desirable position in the ESC.  Again, the decision could be viewed by a jury as motivated in part by Spring's retaliatory evaluation following Murphy's speech.  Therefore, the Court rejects TPS' only argument in support of summary judgment on this claim.

Because the Court is not aware of case law setting forth elements for this type of constitutional claim or any remedies available thereunder, the Court orders significant trial briefing from both parties on this question, including cases from other jurisdictions if necessary.  One court has held that this provision creates a civil damages remedy akin to a "constitutional tort" claim and therefore subject to the OGTCA's rules.  *See Trant v. Okla.*, 874 F. Supp. 2d 1294, 1307 (W.D. Okla. 2012).  *But see Wilson v. City of Tulsa*, 91 P.3d 673, 681 n.8 (Okla. Civ. App. 2004) (noting that OGTCA did not apply to a constitutional claim based on article 2, section 22 of the Oklahoma Constitution).  The Oklahoma Supreme Court's recent decision in *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013), which is discussed in the parties' briefs, also potentially

impacts these questions. In short, the Court is in need of substantial additional briefing and arguments before trying this claim.

## C. § 1983 - Fourth Amendment

TPS argues that it cannot be held liable for Spring and Wheeler's actions of illegally accessing Murphy's email account because these employees were not acting pursuant to any official policy or custom when they accessed the account. *See Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978) (holding that municipal liability may only be imposed under § 1983 where the deprivation is caused by an official policy or established governmental custom). There is no evidence that any TPS official authorized Spring or Wheeler to access Murphy's account or that Spring or Wheeler acted pursuant to any official policy or custom within TPS. When Ballard was informed of their intrusion into Murphy's private email account, he immediately reported it to the TPD and cancelled Murphy's due process hearing to avoid possible unfairness. Ballard's response is certainly not indicative of any participation or acquiescence in their conduct.

In her brief, Murphy argues that Ballard subsequently relied upon allegations by Spring in taking adverse employment actions against Murphy, thereby ratifying the conduct. Specifically, she argues that "blindly relying on the 'fruits' of Spring and Wheeler's illegal search of Plaintiff's private computer, both Ballard and TPS ratified the Fourth Amendment violation." (Pl.'s Resp. to TPS' Mot. for Summ. J. 23.) This argument is without merit. There is no evidence that Ballard or any other TPS decision maker reviewed the private emails or was made aware of their specific contents at any time. Although questions of fact exist as to whether Spring's job target against Murphy played a role in Ballard's subsequent employment decisions regarding Murphy, Spring completed the job target well before accessing the private emails, and the emails did not contribute to Ballard's negative view

of Murphy's job performance. There is not a sufficient link between TPS' policies or decisions and the accessing of Murphy's private email account, and Murphy's "ratification" theory of municipal liability fails.

### D.    § 1983 - Fourteenth Amendment

"To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007). TPS has conceded that Murphy had a protected interest in her employment pursuant to title 70, section 6-101.40 of the Oklahoma Statutes because she had been employed for more than one year, could be terminated only for cause, and was terminated during the term of her contract for the 2011-2012 school year.[14]

The second question is whether Murphy was afforded an appropriate level of process. The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Brammer-Hoelter*, 492 F.3d at 1209. For employees such as Murphy, the law requires a pre-termination hearing consisting of: "(1) oral or written notice [to the employee] of the charges against him; (2) an explanation of the employer's evidence; and [3] an opportunity [for the employee] to present his side of the story." *Montgomery v. City of Ardmore*, 365 F.3d 926, 935

---

[14]  The court previously expressed concern as to whether, under *Isch v. Oklahoma Independent School District No. I-89 of State of Oklahoma*, 963 P.2d 18, 21 (Okla. Civ. App. 1998), Murphy should be considered an at-will employee for whom *Burk* remedies are available, or an employee with a protected property interest in employment for whom such remedies are not available. The Court is now persuaded that *Isch* is factually distinguishable, the Fourteenth Amendment claim is proper, and Murphy had a protected property interest in employment. Therefore, a *Burk* tort claim is unavailable to Murphy. Only the Fourteenth Amendment claim shall proceed, and TPS is granted judgment as to the *Burk* claim.

(10th Cir. 2004); *Brown v. Town of LaBarge, Wyo.*, 97 F. App'x 216, 223 (10th Cir. 2004); *Foraker v. Schauer*, No. CIVA04CV840, 2005 WL 1862072, at *7 (D. Colo. Aug. 4, 2005). Murphy argues that she was never afforded any meaningful opportunity to be heard on the original charges made against her by Spring, which started the process leading to her termination. Given Spring's illegal behavior, lack of credibility, and retaliatory motive, Murphy argues that Spring's evaluation should have had no impact on her TPS employment. TPS' response is that Murphy was provided notice, a hearing, was represented by counsel, and was afforded adequate process with respect to the only true reasons for her termination – failures to report for the reassignments.

The Court concludes that a reasonable jury could conclude that Murphy did not receive meaningful pre-termination process. The notice and the proceeding itself were limited to Murphy's failure to report to the reassignments. By limiting the process in this manner, TPS effectively precluded Murphy from presenting evidence regarding the reasons for her suspension from her original position, which was prompted by Spring's job target. Although Ballard did withdraw this suspension, a jury could conclude that he did so only because Murphy could no longer receive fair process after Spring and Wheeler had viewed her private emails. Importantly, Ballard testified that did not withdraw the suspension because he doubted Spring's negative evaluation of Murphy. Ballard repeatedly testified that Spring's allegations, coupled with Naftzger's investigation and recommendation, played a role in his decision not to reassign Murphy to her former position or any other support position in the ESC. In other words, Ballard's reassignment decisions could have been influenced by Spring's allegations, but Murphy was never given the opportunity to meaningfully respond to these allegations due to the limited nature of the hearing she was provided.

In addition, the limited nature of the notice and hearing arguably prevented Murphy from being able to fully explain her failures to report – the reasons given by TPS for her termination. For example, the Board did not consider correspondence from O'Carroll to Priddy explaining why Murphy was continually failing to appear – namely, because her counsel deemed the reassignments to be unacceptable settlement offers following the original unfair suspension initiated by Spring. In short, TPS successfully limited the hearing to the second half of the story (failing to report), without permitting Murphy to tell the first half (losing her job after being targeted by her corrupt supervisor). A jury could conclude that this was not adequate process in light of (1) Ballard's testimony that Spring's job target played some role in his reassignment decisions, and (2) reassignments may not have ever been necessary but for Spring's original job target against Murphy, which was a serious blemish on an otherwise good employment record. TPS' motion for summary judgment is therefore denied.

### E.    Invasion of Privacy

Oklahoma case law, adopting the Restatement (Second) of Torts, § 652A (1977), recognizes the tort of invasion of privacy as falling into four categories: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity given to the other's private life; and (4) publicity that unreasonably places the other in a false light before the public. *McCormack v. Okla. Pub. Co.*, 613 P.2d 737, 740 (Okla. 1980); *Brill v. Walt Disney Co.*, 246 P.3d 1099, 1102 (Okla. Civ. App. 2010). This case implicates the first category – an unreasonable intrusion into Murphy's private email account. Murphy seeks to hold TPS liable for Spring and Wheeler's conduct.

For reasons explained *infra* Part V.E., Spring and Wheeler are not entitled to summary judgment on the invasion of privacy claim. Under the OGTCA, TPS may be held liable for tortious actions of Spring and Wheeler only if they were acting within the "scope of their employment." *See* Okla. Stat. tit. 51, § 153(A) ("The state or a political subdivision shall be liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment."). By statute,

> "[s]cope of employment" means performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority including the operation or use of an agency vehicle or equipment with actual or implied consent of the supervisor of the employee, but shall not include corruption or fraud[.]

Okla. Stat. tit. 51, § 152(12). TPS contends that Spring and Wheeler were not acting in good faith within the duties of their office or in the employment of tasks lawfully assigned to them when they accessed Murphy's private emails. Murphy argues that they were acting within the scope of their employment because they accessed the emails from their work computers for purposes of assisting TPS' attorneys in preparing for Murphy's termination hearing.

The OGTCA "immunize[s] a governmental entity . . . when, in order to prevail on the particular tort claim sued upon, a plaintiff is required, as a matter of law, to show conduct on the part of a governmental employee that would mandate a determination the employee was not acting in good faith." *Fehring v. State Ins. Fund*, 19 P.3d 276, 283 (Okla. 2001). "In other words, when, for viability, the tort cause of action sued upon requires proof of an element that necessarily excludes good faith conduct on the part of governmental employees, there can be no liability against the governmental entity in a GTCA-based suit." *Id.* Examples of torts for which municipal liability never attaches include malicious prosecution, intentional infliction of emotional distress, and bad-faith failure to pay a workers' compensation award. *Id.* at 283-85.

Unreasonable intrusion upon the seclusion of another – the type of invasion of privacy at issue in this case – requires: (1) the defendant intentionally intruded, physically or otherwise, upon the solitude or seclusion of the plaintiff or his private affairs or concerns, and (2) the intrusion would be highly offensive to a reasonable person. *Munley v. ISC Fin. House, Inc.*, 584 P.2d 1336, 1339 (Okla. 1978) (adopting Restatement (Second) of Torts, § 652B)). The question is whether it is "legally impossible" to prove these elements and also prove that the TPS officials were acting in good faith within the scope of employment. One district court has held it is legally impossible to do so and that an invasion of privacy can never be within the scope of employment because it requires "intentional" conduct. *Garrett v. City of Spencer*, No. CIV-08-501, 2009 WL 3296253, at *5 (W.D. Okla. Oct. 9, 2009) (dismissing invasion of privacy claim against city, reasoning that any "intentional" intrusion could not have been done "in good faith").

This case is at the summary judgment stage, and the Court has the benefit of all facts supporting Murphy's claim. Based on the facts presented, Spring and Wheeler cannot be liable for invasion of privacy and still be found to be acting in good faith.[15] If Murphy is believed, Spring and Wheeler knew they did not have permission to access the account, knew they were reading confidential emails relating to the termination hearing, and were trying to unfairly gain inside information for such hearing. This cannot be considered good-faith conduct. Further, neither Ballard or Priddy ordered them to access the emails. When Priddy became aware of their conduct, he reported it to Ballard, who immediately ordered an investigation. Ballard also cancelled the

---

[15] The Court need not decide, as did the *Garrett* court, that invasion of privacy can *never* be committed within the scope of employment. Further, the Court is not convinced that *Garrett*'s holding is correct. In the examples cited in *Fehring*, the torts required bad faith or malice, not merely intent. It seems possible that an invasion of privacy could be intentional but still within the scope of employment if, for example, employees were ordered by their superiors to access private emails as part of an official investigation.

termination hearing due to fairness concerns. Wheeler and Spring were ultimately terminated, in part, for their participation in this invasion of privacy. Based on these undisputed facts, a jury could not simultaneously conclude that Spring and Wheeler committed the tort and were acting in good faith in the scope of their employment, as defined in Okla. Stat. tit. 51, § 152(1).

### F.      ECPA

The First Amended Complaint alleges a violation of the ECPA but references 18 U.S.C. §§ 2510-2522. This has caused some confusion in the briefs and in the Court's prior order. The Court clarifies this claim.

The ECPA was passed in 1986 and it contains two titles relevant to this case. Title I of the ECPA *amended* the 1968 Wiretap Act, codified as amended at 18 U.S.C. §§ 2510-2522. *United States v. Councilman*, 418 F.3d 67, 81 n.15 (1st Cir. 2005).[16] Title II of the ECPA *created* the Stored Communications Act ("SCA"), codified at 18 U.S.C. §§ 2701-2712. *See id.* ("While drafting the ECPA's amendments to the Wiretap Act, Congress also recognized that, with the rise of remote computing operations and large databanks of stored electronic communications, threats to individual privacy extended well beyond the bounds of the Wiretap Act's prohibition against the 'interception' of communications."). Title I generally prohibits interception and disclosure of certain wire, oral, or electronic communications. 18 U.S.C. § 2511. Title II  generally prohibits unlawful access to stored communications. *Id.* § 2701. Certain actions may violate both provisions, and they have a "convoluted" intersection. *See Councilman*, 418 F.3d at 85.

---

[16]  The Wiretap Act was formerly known as Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *Id.* at 72 n.7.

Murphy now appears to acknowledge that her claim for illegally accessing email from her Yahoo account is a better fit under the SCA – namely, 18 U.S.C. § 2701(a) – rather than under the Wiretap Act. Spring and Wheeler's motion for summary judgment cites the SCA and relies exclusively upon case law interpreting the SCA. Because the Amended Complaint references the ECPA, of which the SCA is part, and the parties do not object, the Court finds that Murphy has properly raised an SCA claim. The Court therefore analyzes Murphy's cause of action as arising under the SCA.

The SCA provides:

> (a) Offense.--Except as provided in subsection (c) of this section whoever--
> (1) *intentionally accesses without authorization* a facility through which an electronic communication service is provided
> . . .
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication *while it is in electronic storage* in such system shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2701(a) (emphases added). Murphy claims that Spring and Wheeler violated this provision and seeks civil remedies available under the SCA. *See also id.* § 2707 (providing civil remedies for violation of SCA). Murphy seeks to hold TPS liable under a theory of vicarious liability. For reasons explained *infra* Part V.F., Spring and Wheeler are not entitled to summary judgment on the ECPA claim. Therefore, the Court must decide if TPS may potentially be held liable for these violations.[17] In the related context of the Computer Fraud Act ("CFA"), which creates a civil cause of action similar to that created by the SCA, courts have held that an employer may be held vicariously liable under general agency principles. *See Charles Schwab & Co., Inc. v. Carter,*

---

[17] This claim is not a common law tort arising under Oklahoma law and is not governed by Oklahoma's statutory "scope of employment" definition set forth above. Thus, the analyses are not identical.

No. 04-C-7071, 2005 WL 2369815, at *6 (N.D. Ill. Sept. 27, 2005) (holding that CFA's civil damages provision is "like a tort action" and that "Congress drafted the CFA with an intent to permit vicarious liability"). However, a plaintiff must show that the employer "affirmatively urged the employee to access the plaintiff's computer system beyond his authorization for their benefit." *Id.* at *7 ("To hold otherwise would exempt a principal from liability when its agent improperly accessed a computer at the direction of the principal."); *Butera & Andrews v. Int'l Bus. Machines Corp.*, 456 F. Supp. 2d 104, 112-13 (D.D.C. 2006) (dismissing vicarious liability claim against corporate defendant because the plaintiff made no allegation that it "'affirmatively urged' or directed any of its employees or anyone else to take the challenged actions").

Extending these principles to the SCA, TPS is entitled to summary judgment. Spring and Wheeler were not acting at the urgence of Ballard or Priddy – the TPS officials more directly involved with the termination hearing. As explained above, Spring and Wheeler were instead acting "rogue" when they accessed the emails. This is evidenced by TPS' response to their behavior – which included initiating an investigation against them, not using the private emails in any manner, and cancelling the termination hearing to avoid any unfairness. Under these factual circumstances, TPS cannot be held vicariously liable for their actions under agency principles.

## IV.    Ballard's Motion for Summary Judgment

Ballard moves for summary judgment on all four claims asserted against him in his individual capacity.

## A.      § 1983 - First and Fourth Amendments

Ballard asserts qualified immunity as to the § 1983 claims, and Murphy must make a two-part showing in order to overcome this assertion: (1) Ballard violated one of her constitutional or statutory rights; and (2) the infringed right at issue was clearly established at the time of Ballard's allegedly unlawful activity, such that a reasonable public official would have known that his challenged conduct was illegal. *Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007).  For the reasons *supra* Part III.A., Murphy did not engage in "citizen" speech and cannot show that Ballard violated her First Amendment rights.

As also explained above, Ballard did not play any personal role in accessing Murphy's private email accounts.  He did not authorize Spring and Wheeler's behavior in any manner.  As soon as he learned of their behavior, he withdrew Murphy's suspension and contacted the TPD.  The Court rejects any "ratification" or other theory suggesting that Ballard somehow participated in the alleged Fourth Amendment violation.  Murphy has therefore failed to establish that Ballard violated her Fourth Amendment rights.

## B.      Article 2, § 22 of Oklahoma Constitution

For the same reasons explained *supra* Part III.B., there are disputed questions of fact as to whether Ballard made any adverse employment decisions based in part on actions taken by Spring in retaliation for Murphy's speech.  Ballard's motion for summary judgment is therefore denied.

## C.      IIED

In order to succeed on an IIED claim, a plaintiff must ultimately prove:  (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff to suffer emotional distress; and (4) the plaintiff's emotional

distress was severe. *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir.1991) (applying Oklahoma law). To satisfy the extreme and outrageous element, a plaintiff must prove the defendant's conduct was so extreme and outrageous as to be beyond all possible bounds of decency. *Eddy v. Brown*, 715 P.2d 74, 77 (Okla.1986) ("Conduct which, though unreasonable, is neither beyond all possible bounds of decency in the setting in which it occurred, nor is one that can be regarded as utterly intolerable in a civilized community, falls short of having actionable quality.") (quotations omitted). Oklahoma law directs the district court to act as a "gatekeeper" and make an initial determination about the outrageousness of the defendant's conduct before sending the claim to a jury. *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1377-78 (Okla.1978) ("The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded so extreme and outrageous as to permit recovery . . . .").

The Court permitted the claim to proceed past the Rule 12(b)(6) stage primarily so the Court could assess Ballard's degree of involvement with and use of Murphy's private emails in conjunction with her termination. Considering the summary judgment record, Ballard's conduct cannot be deemed outrageous. Ballard did not participate in any manner in accessing Murphy's private emails or order that they be accessed. Once he learned of Spring and Wheeler's conduct, Ballard withdrew Murphy's suspension and contacted the TPD. There is no evidence that Ballard was acting in concert with them or used the emails in any manner to facilitate adverse employment actions against Murphy. As explained above, the Court has concerns about Spring's possibly retaliatory job target influencing Ballard's subsequent decisions. However, even assuming this occurred, it certainly does not constitute "outrageous" behavior by Ballard. Further, with respect to adverse employment actions, Ballard reassigned Murphy to a position with the same pay and benefits, and then reassigned her

again in attempt to accommodate her requests. Ballard decided to recommend her termination only after she failed to report for her reassignments. None of Ballard's conduct rises to the level of extreme and outrageous, and he is entitled to summary judgment on this claim.

## V.     Spring and Wheeler's Motion for Summary Judgment

Spring and Wheeler move for summary judgment on all claims asserted against them.

### A.     § 1983 - First Amendment

For reasons explained *supra* Part III. A., Murphy did not engage in citizen speech and cannot establish any constitutional violation. Therefore, these Defendants cannot have violated Murphy's First Amendment rights in conjunction with any role they played in taking adverse employment actions against Murphy.

### B.     § 1983 Claim - Fourth Amendment

Murphy seeks to hold Spring and Wheeler individually liable for violating her Fourth Amendment rights when they accessed her private email accounts and showed such emails to TPS' counsel in preparation for Murphy's original termination hearing. These defendants make two arguments in support of summary judgment: (1) Spring lacked personal participation in the alleged Fourth Amendment violation, and (2) Murphy disavowed any subjective expectation of privacy she had in emails in her Yahoo account because she freely shared her password.[18]

#### 1.     Personal Participation

Wheeler admits accessing the account, but Spring denies any personal participation in the alleged deprivation. The record demonstrates that Spring was Wheeler's supervisor, Wheeler used Spring's work computer to access the emails, Spring and Wheeler both viewed the emails, and Spring

---

[18] Unlike Ballard, Spring and Wheeler did not couch their arguments in terms of qualified immunity. Therefore, the Court did not conduct a qualified immunity analysis.

and Wheeler both took the emails to the meeting with Priddy. The TPD report names both Spring and Wheeler as individuals who accessed the account. This is sufficient to create a question of fact as to Spring's personal participation in the alleged Fourth Amendment violation.

## 2.      Subjective Expectation of Privacy

"The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy." *United States v. Hatfield*, 333 F.3d 1189, 1195 (10th Cir. 2003). Courts determine whether a person has a constitutionally protected reasonable expectation of privacy by making two inquiries: (1) whether the person has exhibited a subjective expectation of privacy in the place or thing searched; and (2) whether the person's expectation of privacy is one that society is prepared to recognize as reasonable. *Id.* Spring and Wheeler argue that Murphy disavowed any subjective expectation of privacy in her personal Yahoo email account by sharing the email address and password with them prior to her suspension. They do not challenge the second element - whether the expectation of privacy is one society recognizes as reasonable.[19]

---

[19] The general rule appears to be that "a subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial ISP." *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010). "[E]mail requires strong protection under the Fourth Amendment; otherwise, the Fourth Amendment would prove an ineffective guardian of private communication, an essential purpose it has long been recognized to serve." *Id.* at 286-87 (reasoning that "the mere ability of a third-party intermediary to access the contents of a communication cannot be sufficient to extinguish a reasonable expectation of privacy"); *In re Apps. for Search Warrants for Info. Assoc. with Target Email Accounts/Skype Accounts*, No. 13-MJ-8163, 2013 WL 4647554, at *3 (D. Kan. Aug. 27, 2013) ("The government may not compel a commercial internet service provider to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause.") (relying upon *Warshak*).

Questions of fact preclude summary judgment as to the first element. Although Spring testified that she and Wheeler knew the password to Murphy's Yahoo account and that it was written on a shared department calendar, Spring also admitted that Murphy never gave them permission to access the account. Further, Murphy denies that she told them her password, denies knowing how they gained access to her account, and denies ever giving them permission to access her account. Even if Murphy had somehow acquiesced to her supervisors using her private email account for work-related purposes while she assisted them, the accessing took place after Murphy's suspension and for the purpose of finding information related to Murphy's upcoming termination hearing. In addition, most of the emails in question were between Murphy and her attorney and were labeled as privileged. Therefore, questions of fact exist as to whether Murphy had a subjective expectation of privacy in the emails.

### C.    Article 2, § 22 of Oklahoma Constitution

There are disputed questions of fact as to whether Spring made any adverse employment decisions in retaliation for Murphy's speech, *see supra* Part III. B., and summary judgment is denied as to Spring. With respect to Wheeler, the record does not indicate that he played any significant role in the identified employment decisions, and Wheeler cannot be said to have violated Murphy's free speech rights under the Oklahoma Constitution.

### D.    ECPA

Spring moves for summary judgment based on this claim based on a lack of personal participation. Both Spring and Wheeler move for summary judgment on grounds that the accessed emails do not qualify as "electronic communication[s] while [they are] in electronic storage," as that phrase is used in the SCA, because the emails had already been opened by Murphy.

### 1.    Personal Participation

For the same reasons explained *supra* Part V.B.1., the Court rejects Spring's argument regarding her lack of participation in accessing the emails and finds sufficient evidence to create a question of fact as to whether Spring herself violated the SCA.

### 2.    SCA's Definition of "Electronic Storage"

The SCA contains the following definition of "electronic storage":

> (17) "electronic storage" means--
> (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and
> (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication;

18 U.S.C. § 2510(17)(A), (B).  Courts have generally held that § 2510(17)(A) does not extend to email messages stored on an internet service provider's server if such messages have already been opened by the intended recipient.  *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004) (collecting cases reasoning that opened emails are no longer in "temporary, intermediate storage"); *United States v. Weaver*, 636 F. Supp.2d 769, 771 (C.D. Ill. 2009) ("Because the emails here have been opened, they are not in temporary, intermediate storage incidental to electronic transmission."). Courts disagree, however, as to whether opened email messages stored on a web-based email service, such as Hotmail or Yahoo, are covered by § 2510(17)(B).  *Compare, e.g.*, *Theofel*, 359 F.3d at 1077 ("[W]e think that prior access is irrelevant to whether the messages at issue were in electronic storage."), *with Lazette v. Kulmatycki*, 949 F. Supp. 2d 748, 758 (N.D. Ohio 2013) (holding that "only e-mails awaiting opening by the intended recipient" are covered); *Weaver*, 636 F. Supp.2d at 771 (explaining that *Theofel*'s reasoning should not extend to web-based email providers such as Hotmail and that, if its reasoning was intended to apply to web-based email providers, *Theofel* was wrongly

decided); *Fraser v. Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 635–36 (E.D. Pa. 2001) (holding that "backup protection" includes only temporary backup storage pending delivery, and not any form of "post-transmission storage").

For purposes of summary judgment, the Court assumes that opened emails are not covered by the SCA. However, Defendants are still not entitled to summary judgment because they have failed to demonstrate, as a factual matter, that all of the accessed emails had already been opened by Murphy. In fact, Spring and Wheeler failed to present *any* evidence supporting their assertion that all emails had been previously read by Murphy. (*See* Statement of Fact 8 (discussing emails but not providing evidence as to whether such emails had been opened).) Thus, Defendants are not entitled to summary judgment based on the "opened" status of the emails. The parties should be prepared at the pretrial conference to discuss the split in authority explained above and their proposed proof on the "opened" or "unopened" status of the accessed emails.

### E.    Invasion of Privacy

In cases involving an unreasonable intrusion upon the seclusion of another, a plaintiff must show: (1) the defendant intentionally intruded, physically or otherwise, upon the solitude or seclusion of the plaintiff or his private affairs or concerns, and (2) the intrusion would be highly offensive to a reasonable person. *Munley v. ISC Fin. House, Inc.*, 584 P.2d 1336, 1339 (Okla. 1978) (adopting Restatement (Second) of Torts, § 652B)). Defendants challenge Murphy's ability to satisfy the "highly offensive" element of an invasion of privacy claim.

A reasonable jury could conclude Spring and Wheeler's actions constitute a highly offensive invasion of privacy for two reasons. First, the Restatement (Second) of Torts § 652B, upon which

Oklahoma's cause of action is based, contains examples of invasions of privacy that are comparable to the facts presented. The Restatement provides the following language and illustration:

> It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account . . . .
> A is seeking evidence for use in a civil action he is bringing against B. He goes to the bank in which B has his personal account, exhibits a forged court order, and demands to be allowed to examine the bank's records of the account. The bank submits to the order and permits him to do so. A has invaded B's privacy.

Restatement (Second) of Torts § 652B cmt. b & illus. 4. Like these examples, Spring and Wheeler accessed and opened private information without Murphy's permission, attempting to find information for use in the termination hearing. The Court finds no reason to treat this case differently because they opened emails rather than actual mail.

Second, in cases involving similar intrusions into private email accounts, courts have permitted invasion of privacy claims to proceed or even granted summary judgment in favor of the plaintiff. *See Mintz v. Mark Bartelstein & Assocs., Inc.*, 906 F. Supp. 2d 1017, 1034 (C.D. Cal. 2012) (granting the plaintiff's motion for summary judgment on invasion of privacy claim where plaintiff's former co-worker "deliberately accessed [the plaintiff's] Gmail account without permission, opened several emails, and even read their contents," including his agreement with his new employer); *Thayer Corp. v. Reed*, No. 2:10-CV-423, , 2011 WL 2682723, at *10-11 (D. Me. July 11, 2011) (denying motion to dismiss where former employee misappropriated private emails between former employer's human resources manager and counsel) ("In light of the Restatement's pronouncement that both opening private mail and tapping and recording telephone conversations would be an invasion of privacy, the Court concludes that the misappropriation of private emails could be similarly tortious."); *Doe v. City & Cnty. of San Francisco*, No. C10-4700, 2012 WL 2132398, at *5

(N.D. Cal. June 12, 2012) (denying motion for judgment as matter of law where plaintiff presented evidence that "her email inbox was deliberately searched" by employer and that employer read an email to a union steward regarding workplace conditions) (reasoning that a reasonable juror could find the invasion "highly offensive" and to be a "breach of social norms").  Assuming a jury credits Murphy's version of events, Spring and Wheeler deliberately accessed Murphy's Yahoo account without permission and read at least twenty-six private communications.  Spring and Wheeler's motion for summary judgment is denied.

**F.      IIED**

The elements of IIED are set forth *supra* Part IV.C.  Spring and Wheeler challenge the second element, arguing that their conduct was not so extreme and outrageous as to be beyond all possible bounds of decency.  *See Eddy v. Brown*, 715 P.2d 74, 77 (Okla.1986) ("Conduct which, though unreasonable, is neither beyond all possible bounds of decency in the setting in which it occurred, nor is one that can be regarded as utterly intolerable in a civilized community, falls short of having actionable quality.")  When confronted with harassing or retaliatory conduct in the employment setting, Oklahoma courts have repeatedly held that such conduct was not sufficiently outrageous. *See, e.g., Eddy*, 715 P.2d at 76-77 (multiple instances of ridicule and harassment and alleged retaliatory reassignment from graveyard shift following complaint with National Labor Relations Board were not sufficiently outrageous); *Miner v. Mid-Am. Door Co.*, 68 P.3d 212, 223-24 (Okla. Ct. App. 2002) (employer's response to reports of extremely hostile work environment, even assuming it was unreasonable and untimely, was not sufficiently outrageous); *Mirzaie v. Smith Cogeneration, Inc.,* 962 P.2d 678, 682-83 (Okla. Ct. App. 1998) (employer making harassing phone calls in the middle of the night, requiring him to do unnecessary work, and terminating him two hours before his

wedding were not sufficiently outrageous); *Anderson v. Okla. Temp. Servs., Inc.*, 925 P.2d 574, 577 (Okla. Ct. App. 1996) (former supervisor's conduct of describing how sexual favors could be used to obtain business, discussing former employee's faults with another employee, making lewd remarks about former employee, leaving door open to restroom, and commenting on her sex life within hearing distance of employees found was not sufficiently outrageous); *see generally Kisselburg v. AR Allen Group, Inc.*, 2005 WL 2897431, at *4 (W.D. Okla. Nov. 1, 2005) (noting that "[d]ecisions applying Oklahoma law have found that employment-related fact scenarios generally do not support intentional infliction of emotional distress claims" and that such a claim requires "extremely rigorous proof"). With these principles in mind, the Court addresses Spring and Wheeler's conduct.

1.  **Spring**

Construed favorably to Murphy, the record shows the following conduct by Spring: (1) submitting an inaccurate and unfair job target to Naftzger after Murphy reported problems within the athletic department, which (a) led to Naftzger's investigation and recommendation for termination, and (b) created a negative impression of Murphy in Ballard's mind, which persisted while Ballard made other employment decisions; and (2) playing a role in accessing Murphy's private Yahoo email account and reading private emails between Murphy and her lawyer regarding the termination hearing.

Spring's conduct described above is similar to, if not less severe, than retaliatory actions found to be insufficient to support an IIED claim. At most, Spring's retaliatory job target set in motion a chain of events that led to her termination. This chain of events included Murphy failing to report for reassignments. Spring played no role whatsoever in the reassignments, preventing Murphy from reporting for those reassignments, or the final termination decision. Even assuming

it was inaccurate, retaliatory, and self-serving, the job target was essentially an unjustified poor performance evaluation.

This is not sufficient to satisfy the rigorous standard explained above. *See Romero v. City of Miami,* --- F. Supp. 2d ---, 2014 WL 1119696, at *10 (N.D. Okla. 2014) (dismissing IIED claim where employee raised concerns about drug testing policy and then co-workers were instructed not to speak to him, an inquiry was made into his performance, the locks were changed on his office, and he was ultimately terminated and allegedly defamed by being called an extortionist and snitch). It is certainly less severe than a retaliatory termination directly following whistleblowing on matters of aviation safety. *Cf. Kisselburg*, 2005 WL 2897431, at *4 (denying motion to dismiss IIED claim where the plaintiff was terminated after reporting occupational safety and health risks related to dangerous repair of an aircraft) ("[G]iven the nature of the allegations in this case as involving matters of aviation safety, the court determines that this claim should not be foreclosed at the pleadings stage."). Here, Spring was not the final decision-maker as to the suspension and was not involved at all in the ultimate termination.

Second, with respect to accessing emails, this conduct is also insufficient to support an IIED claim. While perhaps "highly offensive" to a reasonable person, it cannot be said to be so outrageous as to transcend the bounds of human decency. *See Romero*, 2014 WL 1119696, at *10 (noting that "highly offensive" standard for invasion of privacy is less onerous than "outrageous" standard for IIED). Further, accessing these emails played no role whatsoever in Murphy's ultimate termination, as Ballard cancelled that termination hearing to avoid any possible unfairness to Murphy.

### 2. Wheeler

Spring completed the job target, and there is no evidence that Wheeler had any significant involvement with this process. The communications regarding the job target and Naftzger's investigation were between Spring and Naftzger. Even if he had been involved in the job target, for the reasons explained above, there is no evidence that Wheeler engaged in any conduct that can be deemed "outrageous." Although Wheeler accessed Murphy's private emails and provided them to Spring for use during Murphy's original termination hearing, the Court again finds that this conduct is not sufficiently "outrageous" to support an IIED claim.

## VI. Pruitt's Motion for Summary Judgment

In response to Pruitt's motion for summary judgment, Murphy conceded that Pruitt was entitled to summary judgment on all claims and did not dispute Pruitt's statement of facts. The Court has independently reviewed the record and also concludes that Pruitt did not significantly participate in any of the events giving rise to Murphy's claims. Therefore, Pruitt is entitled to summary judgment on all claims.

## VII. Defendants' Motions to Strike (Docs. 104, 106)

Based on late and/or inadequate disclosures by Murphy, all Defendants move the Court to: (1) strike any claim for damages; (2) strike the Whistleblower Complaint Form attached as Exhibit 7 to Murphy's response to the motions for summary judgment; and (3) limit witnesses and exhibits to those listed in initial disclosures provided on September 27, 2013. Defendant Spring and Wheeler also move the Court to strike any "[d]efenses to [their] motion for summary judgment which rely on Plaintiff's claim that she was whistleblower . . . as a sanction for failure to provide Exhibit 7." (Mot. to Strike 18.)

## A.    Damages/Witnesses

Federal Rule of Civil Procedure 26(a)(1)(A) provides, in part:

Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment; (ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment; (iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]

Federal Rule of Civil Procedure 26(e)(1)(A) provides, in part:

A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Federal Rule of Civil Procedure 37(c)(1) provides, in pertinent part:

(1) If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

When determining whether a violation of Rule 26(a) or (e) is harmless or substantially justified for purposes of Rule 37 sanctions, the Tenth Circuit Court of Appeals has identified four factors to consider: (i) the prejudice or surprise to the impacted party; (ii) the ability to cure the prejudice; (iii) the potential for trial disruption; and (iv) the erring party's bad faith or willfulness. *Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). It is the burden of the non-moving party to show that the failure to comply with the rules is substantially justified or harmless. *See Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995).

It is not disputed that, on September 27, 2013, Murphy provided Initial Disclosures and Preliminary Witness and Exhibit Lists. The Initial Disclosures listed damages as "back pay and lost benefits; front pay until normal retirement; compensatory damages; punitive damages; attorneys fees and costs in excess of $75,000." On October 4, 2103, Priddy sent a letter to Murpy's counsel, Dan Smolen ("Smolen"), stating that the computation of damages was deficient and requesting supplementation by October 8, 2013. Murphy's deposition was taken on February 5, 2014. On February 17, 2014, Priddy sent another letter requesting an amended damages computation no later than February 20, 2014. On February 18, 2014, Smolen's associate, Lauren Lambright ("Lambright"), responded that they were "working on that" and would have an amended version ready that day. On February 20, 2014, the parties held a conference. The same day, Priddy sent a follow-up letter confirming that counsel would provide the supplemental information within a few days. The parties disagree as to what happened next.

Smolen has submitted an affidavit stating that Amended Initial Disclosures (providing more detailed damages calculation) and revised Preliminary Witness and Exhibit List (adding a treating physician, records custodian, and pastor as witnesses) were provided on February 20, 2014, the same

day as Priddy's letter. Smolen admits that he inadvertently failed to change the certificate of service date, such that these amended documents are dated September 27, 2013. Smolen has no proof of transmission, such as an email or cover letter with the February 20, 2014 date.

In contrast, Defendants claim that they first received these amended documents on September 4, 2014, over two months after the June discovery cut-off. On September 4, 2014, Phyllis Walta ("Walta"), counsel for Spring and Wheeler, sent an email to Smolen and Lambright discussing Exhibit 7 and failures to provide updated damages calculation and updated witness and exhibit list. Less than twenty minutes later, Lambright responded by attaching the Amended Initial Disclosures and Preliminary Witness and Exhibit List. She stated that her records showed they "were both completed back in September 2013" and that this should "take care of your concerns regarding those two issues." Smolen contends Lambright was confused when she referenced September 2013, due to failure to change the service date upon transmission of the revised documents on February 20, 2014.

On September 8, 2014, the parties had another conference, where Smolen and Lambright continued to assert the documents were originally provided in September 2013. Naturally, Defendants did not find this credible because that was the date of transmission of the Initial Disclosures. Murphy's counsel realized this error sometime after the conference but did not notify Defendants prior to September 12, 2014, when Defendants filed their motions to strike. Smolen first set forth his explanation that the documents were sent on February 20, 2014 in his affidavit in response to the motions to strike.

The Court makes the following factual findings. The amended versions of the documents were drafted sometime after February 17, 2014 but before September 4, 2014. It is not plausible that

Lambright drafted a damages calculation and added three witnesses in the twenty-six minutes between Walta's email and her response. It is also not plausible that she purposefully back-dated them to the date of the Initial Disclosures. They were more likely quickly located on her computer system and sent with the unchanged September 2013 date. However, Murphy's counsel has no proof whatsoever that these revised documents were ever *actually sent* prior to September 4, 2014. If documents are sent, they are typically done so pursuant to email or cover letter bearing the correct date (regardless of the service date). Further, it does not seem plausible that both sets of Defendants somehow lost the documents and re-requested them as late as September 4, 2014. Based on the record, the Court finds: (1) the amended disclosures were most likely completed sometime after Murphy's deposition but before the discovery cut-off; (2) they were inadvertently never re-dated or sent prior to the discovery cut-off; and (3) they were sent within thirty minutes once the problem was brought to their attention on September 4, 2014, two months after the discovery cut off but two months before he scheduled trial.

The Court further finds that Murphy's counsel is at fault for failing to timely comply with the rules and precluding discovery as to the amended damages calculation and three new witnesses but that, in light of the relief ordered below, any prejudice can be cured.[20] Although they are not at fault for the discovery failures, it is unclear why Defendants' counsel failed to continue requesting the information when Murphy's counsel failed to provide responsive documents to Priddy's February 20, 2014 follow-up letter. These documents were on counsel's radar and were discussed at the conference. Waiting until two months after the discovery cut-off to make the next request and move

---

[20] The Court does not find evidence of bad faith or willful conduct.

the Court for any relief is a risky strategy, given that Murphy had provided at least some information regarding damages in September 2013.

The Court orders that (1) Murphy will be permitted to present damages evidence consistent with the calculation in the Amended Initial Disclosures; (2) Murphy will be permitted to call the witnesses identified in the amended witness and exhibit lists; and (3) Defendants shall be permitted to re-depose Murphy and/or depose the new witnesses to avoid any prejudice, if they so desire, with Murphy bearing all attorneys' fees and costs for these depositions as a sanction for untimely disclosure pursuant to Rule 37(c)(1)(A). If Defendants desire this additional discovery, the parties shall complete such discovery before December 1, 2014, the date of the rescheduled pretrial conference. If the discovery cannot be completed by that time, the parties shall move the Court for relief.

**B.      Exhibit 7**

Murphy claims that she first located Exhibit 7, an undated Whistleblower Complaint Form, after the discovery cut-off and after Defendants filed their motions for summary judgment. Thus, Murphy admits that Defendants saw this document for the first time as an attachment to her summary judgment responses.

As an initial matter, the Court denies any request to strike any and all evidence regarding Murphy's report to Harris or her status as a "whistleblower." Murphy testified in detail about such report and even about the existence of a whistleblower complaint form. Even without the form, she has ample evidence of whistleblower status, and there is no reason to preclude any such evidence based solely on late production of Exhibit 7. Whether to exclude Exhibit 7 itself is a more difficult question. It is undated and was produced late. At the same time, it is consistent with and amplifies

deposition testimony provided earlier. It does not identify different concerns than those listed in Murphy's deposition or recorded statement. Because it is consistent with and was expressly referenced in Murphy's deposition testimony and recorded statement, Murphy has shown that late production of the document is harmless. Further, Murphy's counsel has represented that it was produced as soon as Murphy located it, and the Court finds that its late production is therefore substantially justified.

## VIII. Conclusion

Defendant School District's Motion for Summary Judgment (Doc. 69) is denied in part and granted in part. It is denied as to Murphy's claim arising under article 2, § 22 of the Oklahoma Constitution and as to Murphy's § 1983 claim premised upon violation of her Fourteenth Amendment procedural due process rights. It is granted as to all other claims.

Defendant Keith Ballard's Motion for Summary Judgment (Doc. 72) is granted in part and denied in part. It is denied as to Murphy's claim arising under article 2, § 22 of the Oklahoma Constitution and granted as to all other claims.

Defendants Stephanie Spring and Jon Wheeler's Motion for Summary Judgment (Doc. 75) is granted in part and denied in part. As to Murphy's § 1983 claim premised upon a First Amendment violation and the IIED claim, it is granted as to both Spring and Wheeler. As to Murphy's claim claim arising under article 2, § 22 of the Oklahoma Constitution, it is granted as to Wheeler. It is denied in all other respects.

Defendant Latricia Pruitt's Motion for Summary Judgment (Doc. 77) is granted, and Pruitt is terminated as a party.

Defendants' Motions to Strike (Doc. 104, 106) are denied as to all requests. Discovery is re-opened as set forth above and shall be completed by December 1, 2014 unless otherwise ordered by the Court.

Plaintiff's Unopposed Motion to Reschedule the Pretrial Conference (Doc. 128) is GRANTED, and the Pretrial Conference is rescheduled for Monday, December 1, 2014, at 1:00 pm. A proposed Pretrial Order consistent with this Opinion and Order shall be filed by November 20, 2014.

SO ORDERED this 4th day of November, 2014.


_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**